**I. S. JOSEPH COMPANY, INC.,**
Plaintiff-Appellant,

v.

**CITRUS FEED COMPANY, INC., et al.,**
Defendants-Appellees.

No. 72–3561.

United States Court of Appeals,
Fifth Circuit.

Feb. 20, 1974.

Rehearing and Rehearing En Banc
Denied April 3, 1974.

William A. Gillen, Edward M. Waller, Jr., Tampa, Fla., for plaintiff-appellant.

Monterey Campbell, Bartow, Fla., for defendants-appellees.

Before BELL, COLEMAN and RONEY, Circuit Judges.

COLEMAN, Circuit Judge:

This is a diversity suit for breach of an alleged oral contract to deliver 10,000 tons of dried citrus pulp for use in the manufacture of pelletized cattle feed. The verdict of the jury was for the defendants, both as to the claim and as to a counterclaim. We affirm.

The plaintiff, I. S. Joseph Company, of Minneapolis, Minnesota, was in the business at Tampa, Florida, of making citrus pulp pellets for sale in foreign markets, particularly Europe. It purchased citrus pulp from various producers in Florida.

The defendant, Citrus Feed Company, with plants at several places in Florida, was in the business of processing bulk, dried citrus pulp as it came from the primary citrus processors who were making frozen citrus juice and the like. Citrus Feed's method of operation was to set up its tanks, driers, etc., on the property of the primary processors, taking their total output of pulp as originally processed, drying it, and turning it into feed pulp which could thereafter be pelleted, as accomplished in Joseph's operation.

From 1966 to 1969, Citrus Feed had been selling pulp to Joseph. These sales had been made, however, as the commodity was produced, or substantially so. The use of advance contracts by which pulp was purchased ahead of the actual citrus season had not been initiated.

At the onset of the 1969–1970 citrus fruit season, there were negotiations between Citrus Feed and Joseph, handled exclusively by one representative of each, for the purchase and sale of citrus pulp. These representatives were Jenkins, sales manager for Citrus, and Kiefer, Tampa manager for Joseph. There were no witnesses to their negotiations or to their purported agreements.

On the trial in the Court below Kiefer testified that Jenkins, on August 25, verbally and unconditionally agreed to deliver 5,000 tons of pulp at an agreed price and that on September 25 Jenkins unconditionally agreed to deliver an additional 5,000 tons.

Jenkins, however, testified that he had agreed to deliver only such quantities of pulp as Citrus might process in excess of that required to supply its regular customers.[1]

There was never any formal, *written* contract.

On August 25, 1969, in separate documents, Joseph mailed to Citrus two "Confirmations of Purchase" for 2,500 tons each of dried citrus pulp, to be shipped between the latter half of December, 1969 through May, 1970. An exactly similar document was sent for the purchase allegedly made on Septem-

---

1. Oddly enough, in an unusually tedious trial, marked by frequent wrangles over inconsequential matters, neither Joseph nor Citrus made a definite effort to prove the existence or non-existence of such an "excess", or the amount of it at any given time. In the briefs, our attention is directed to some isolated figures from which we are invited to draw conclusions on this subject. We find this proof too insubstantial to support a view grounded on undisputed evidence. We are not a fact finding Court. We apply the familiar rule that disputed factual issues must be viewed in the light most favorable to the jury verdict.

ber 25 for 5,000 tons to be "scattered January through June, 1970". Joseph's Vice President testified that it was the custom in its Minneapolis operations to send along a duplicate copy which the seller was required to sign and return but that it was not done in this case because things were just not done that way in Florida.

Citrus made no response, written or otherwise, to any of the "Confirmations".

On October 13, 1969, Joseph wrote a letter to Citrus:

"Just a note to bring you up to date on our export activities and to advise that the 10,000 tons of citrus pulp which we will receive from you during this campaign has been sold to a European consumer and we now look forward to receiving the product and fulfilling the contract with our European buyer."

It is to be noted that this letter referred to "citrus pulp which we will receive from you". It did not use terms such as "which you have contracted (or agreed) to deliver". It did express an expectation of receipt.

This letter pinpoints the date of the sale of the expected tonnage to European purchasers as somewhere around the first of October. This was before Citrus delivered any pulp to Joseph. The European sales thus had to be made in reliance upon whatever Jenkins had agreed to prior to the issuance of the "Confirmations".

At any rate, Citrus Feed made no response to this letter.

Thereafter, at various intervals between November and February, sometimes on a daily basis, by freight car or truck, Citrus Feed did ship a total of 2,500 tons to Joseph, at the price named in the "Confirmations".

According to proof on behalf of Joseph, a Citrus representative told a Joseph representative at a meeting in Lakeland on December 18 that Joseph was lucky to have its contract with Citrus because the price of pulp had gone up and that Citrus would fulfill its obligations under the "contracts".

After February, 1970, Citrus made no further shipments and this lawsuit followed, seeking, *inter alia,* to recover the difference between the claimed contracted purchase price and what Joseph allegedly had to pay elsewhere to cover its commitments to its foreign purchasers.

The fiscal situation of the parties was affected by the following operative facts: It cost Citrus Feed $19 per ton to produce the pulp. It was obligated to pay the primary producer the difference between $22 and the prevailing market price per ton for raw pulp. If there was a contract with Joseph at $22.50 and the prevailing price in the market place was $25, Citrus would owe the primary producer $3 per ton. Thus its production costs would be $22 a ton and it would realize a net profit of only 50 cents per ton. Serious problems developed when the pulp market price went to $30 per ton in December and much higher thereafter. In a $30 situation, Citrus would have its fixed cost of $19 plus the $8 rebate to the primary processor, which meant that it would lose $4.50 on every ton shipped to Joseph. The market in January rose to $35, which would escalate the net loss to $9.50 per ton. Joseph says this is what motivated Citrus Feed to stop delivering for $22.50 per ton.

In its complaint, Joseph alleged that to meet its European obligations it had to pay $127,000 more for the 7,500 tons of pulp in the open market than it would have cost if obtained at $22.50 per ton and had other costs besides. The case thus presents serious *loss potentials* for both the appellant and the appellee.

In the meantime, before Citrus Feed stopped its deliveries, another set of circumstances came into play. According to testimony on behalf of defendant-appellee, Joseph was inordinately slow in paying for the delivered pulp. Checks were dated as much as thirty days ahead of the time Citrus received them. This continued in such a fashion that by Christmas Joseph owed Citrus in the

neighborhood of $60,000 on unpaid delivery invoices. While this was going on, an official of Joseph led Citrus to believe that they could make an arrangement by which Joseph would thereafter purchase the entire production of Citrus Feed. An official of Joseph insisted that Citrus representatives come to Minneapolis during the Christmas holidays for a conference in this regard. The Citrus Feed men hoped they would be paid during this visit but were afraid to mention it because it might blow up the negotiations for the sale of their entire output. They went to Minneapolis, where they got into a rather stormy argument with Mr. Joseph about whether they were under an unconditional contract to deliver the 10,000 tons named in the prior confirmations. Both as to pay and as to a total sales agreement they departed sackless. To cap it off, Joseph refused to pay for $876.40 worth of Citrus pulp shipped on January 22 and for $2,069.13 worth shipped on February 16. The Defendants counterclaimed for these amounts. Joseph did not deny failure to pay but contended that one shipment was wholly unfit for use and asserted that the other shipment was not paid for because it had become apparent that Citrus Feed was not going to comply with the agreements of August 25 and September 25.

As evidenced by the Complaint and by the Plaintiff's opening statement to the jury, this law suit began as one for breach of an unconditional oral contract. At the close of all the proof, Joseph moved for a directed verdict as to liability on the grounds: (1) The testimony and the confirmations established a contract as a matter of law; (2) The evidence established a ratification of the contract, accompanied by partial performance; and (3) The Defendants were estopped to deny the existence of an unconditional oral contract.

Citrus Feed defended on the ground that it had agreed only to deliver excess pulp and on the second ground that if there had been a contract Jospeh's failure to pay promptly, coupled with a re-

fusal to pay at all for two shipments, excused it from further performance. It moved for a directed verdict on the latter ground.

The Trial Judge denied both motions and submitted the case to the jury. The jury found for Citrus Feed.

While there was a general verdict, the jury had evidence from which it obviously could have found that on August 25 and September 25 Sales Manager Jenkins, acting for Citrus Feed, agreed only to deliver excess pulp. On this appeal, however, Joseph travels on the argument that the:

"Plaintiff does not contend that the Confirmations of Purchase became the contract. Rather, the Confirmations of Purchase together with the letter of October 13, the discussion of December 18, the shipment by Defendants, and the silence of Defendants throughout, all create an estoppel which precludes the Defendants from denying that they were unconditionally obligated to sell and deliver 10,000 tons."

This litigation involved a contract allegedly made and to be performed in Florida. Thus, where applicable, we look to Florida law.

■■ The failure of Citrus Feed to respond to the "Confirmations" sent by Joseph served only to deprive it of a defense under the Statute of Frauds. It did not relieve Joseph of the burden of convincing the jury by a preponderance of the evidence that an oral contract was, in fact, made. This necessarily would include the essential terms of the contract, The Uniform Commercial Code, 19A Fla.Stat.Ann., § 672.2–201, and the accompanying Code comments. By its appellate contentions hereinabove quoted the appellant concedes this point.

We are thus remanded to the issue of contract by estoppel—and that as a matter of law, not as an issue of fact.

In its excellent brief, appellant cites a wealth of cases dealing with the general principles of ratification by silence, estoppel by silence, estoppel by inaction,

estoppel by words or action, estoppel by conduct, and estoppel by acquiescence. These cases are within the peripheral range of this litigation but, in our opinion, are not, as a matter of law, controlling. We, therefore, abstain from re-sweeping the field by an extended discussion of their applicability or inapplicability to the issues presently before us, although that they accurately reflect the law in general is not to be doubted.

We think the matter is capable of solution by looking directly to Florida law.

In the case of Enstrom v. Dunning, 136 Fla. 253, 186 So. 806, 812 (1939) the Supreme Court of Florida enunciated the rule:

"No one should be denied the right to set up the truth unless it is in plain contradiction of his former allegations or acts. If an act or admission is susceptible of two constructions, one of which is consistent with a right asserted by the party sought to be estopped, it forms no estoppel."

■ An estoppel will not be raised against one because he was silent where there was no duty on him to speak, 12 Fla.Jur., Estoppel and Waiver, § 42, page 419.

■■ We must be careful to point out that this entire controversy was between the original parties to the original agreement—they and no others. Joseph knew what the agreement was from the very beginning. Nothing it could have been told would have added to that knowledge. No silence could have left Joseph under any misapprehension of the facts. This was not a case wherein copies of Joseph's confirmations were forwarded to third parties who relied upon them to their detriment. There was nothing inconsistent about the delivery of the 2,500 tons of pulp. Citrus Feed had orally agreed to deliver—the dispute hinges around the amount it was obligated to deliver. The trial record left the jury free to choose between two inferences, one that Citrus did deliver from excess, the other that it did not. The verdict indicates that the jury ac-

cepted the former. These considerations involved inferences to be drawn from known or disputed facts, and about which reasonable men could readily differ. It, therefore, was appropriate to submit the issues to the determination of a jury. This the Trial Court did, with peculiarly clear and succinct instructions which, among other things, informed the jury that it should consider the conduct of the parties during previous citrus seasons as well as during the 1969–1970 season, including the correspondence between them.

■ As to delay in payments and failure to pay at all, Citrus Feed's second defense, we find the jury to have been properly instructed and as to that ground the verdict is supported by substantial evidence.

The Plaintiff-Appellant might well have won the verdict in this case. If this had happened it would, on this record, have been impervious to appellate attack. Joseph might have won before another jury at some other time or place. The immutable fact is that it lost. Perceiving no legal error in the trial, we cannot interfere.

Neither do we detect error as to the verdict on the counterclaim.

The Judgment of the District Court is

Affirmed.

BELL, Circuit Judge (concurring in part and dissenting in part):

I respectfully dissent as to one issue. The theory of the suit was breach of an oral contract. The defenses, as pertinent here, were denial of the existence of the alleged contract and, in the alternative, if a contract existed, a claim of material breach by the plaintiff. Both defenses were submitted to the jury.

Plaintiff contends on appeal that the trial court erred (1) in not determining as a matter of law that there was a contract as alleged and (2) in also submitting the defense of a breach of the contract to the jury. I agree with plaintiff

as to the first contention but not as to the second. The jury returned a general verdict and it would be necessary under my view to remand the case for a new trial on the breach of contract defense.[1]

A representative of Joseph negotiated with the sales manager of defendants on two occasions prior to the 1969–70 citrus season for the purchase by Joseph of citrus pulp. The sales manager testified for defendants as follows:

". . . We came to an arrangement whereby I would not go out and get any additional customers; I wouldn't go and try to take on a new dairy for the season. Any excess feed that we had during the season we would agree to sell to I. S. Joseph Company. . . ."

Following these negotiations, Joseph issued to defendants three documents entitled "Confirmation of Purchase." Two were dated August 25, 1969, each confirming a purchase of 2,500 tons of citrus pulp at a stated price. The other was dated September 25, 1969 and was for 5,000 tons at the same price. On October 13, 1969 the representative of Joseph who had carried on the negotiations wrote to the defendants, referring to the 10,000 tons of citrus pulp which was to be received from them and stating that it had been sold to a European customer.

The defendants thereafter delivered 2,500 tons of pulp to Joseph at the agreed price. Meanwhile the market price had increased in stages from $22.-50 per ton to $40.00 per ton. The last shipment was made by defendants on February 16, 1970. In early March and prior to March 6, 1970, they advised Joseph that they would make no further shipments.

Defendants denied that there was a contract, contending that they refused to make a firm contract because Joseph would not agree to a "freeze" clause.

The difficulty with this position is that defendants' sales manager testified to the contrary, i. e., that the agreement was for excess pulp only. This means that defendants would be excused on a *pro tanto* basis from performing to the extent that no excess was available, whether due to a freeze or otherwise. I am unable to discover any contention by defendants that they failed to deliver because of lack of excess product.

It appears that negotiations continued between the parties for several months over a contract whereunder Joseph would take all of defendants' production but that these negotiations were unsuccessful. It is to be noted that these negotiations were aside from the contract, if there was a contract, for the acquisition of the 10,000 tons of pulp.

The district court concluded that the question whether a contract existed presented a jury issue. I disagree and am thus also in disagreement with the majority.

I find it unnecessary to go beyond, first, the testimony for defendants that they intended to sell any excess citrus pulp to Joseph, and second, the confirmations of purchases and the letter of October 13 which are consistent with that stated intention. These documents confirmed what defendants say they agreed to do, at least up to 10,000 tons of any excess pulp. This much was undisputed and made the contract as I see it. This view is buttressed by defendants' shipping 2,500 tons under one of the August 25 confirmations.

The other issue submitted to the jury under the general verdict was the alternative assertion that plaintiff breached the contract. I agree with the majority that this issue was for the jury but, as noted supra, because of the general verdict a new trial on this single issue would be necessary even if my views had prevailed.

1. Special interrogatories under Rule 49(b), F.R.Civ.P., might have obviated a new trial.