**TRANSAMMONIA EXPORT CORPORATION, Plaintiff-Appellant Cross Appellee,**

**v.**

**CONSERV, INC., Defendant-Appellee Cross Appellant.**

No. 75–3696.

United States Court of Appeals, Fifth Circuit.

June 23, 1977.

Monterey Campbell, Bartow, Fla., for plaintiff-appellant cross appellee.

E. Snow Martin, Michael D. Martin, Lakeland, Fla., for defendant-appellee cross appellant.

Before WISDOM and GEE, Circuit Judges and BOOTLE *, District Judge.

WISDOM, Circuit Judge:

The issue in this breach of contract action is whether sufficient evidence supports the jury's verdict. In its general verdict the jury necessarily decided that an oral contract for the sale of anhydrous ammonia existed between the parties but that the plaintiff should not receive the full amount of its alleged damages. The defendant-appellee, Conserv, Inc., challenges the imposition of liability for breach of the oral contract; the plaintiff-appellant, Transammonia Export Corp., challenges the amount of damages awarded. We reject both appeals.

I.

Transammonia, an exporter of fertilizer and fertilizer raw materials, began negotiations in the Spring of 1972 with Conserv, a dealer in anhydrous ammonia, for the purchase of ammonia for export. The negotiations for Transammonia were conducted by Ronald Van Kleek, a vice president of the company. Wyllys Taylor, a principal stockholder of Conserv, represented the defendant. According to Stephan Ward, another Transammonia vice president, these negotiations led to an oral agreement for the sale of 60,000 short tons of ammonia. This agreement was reached at a June convention of persons engaged in the fertilizer business. Transammonia agreed to pay $28 a ton for the chemical. It was to be delivered at a rate of 15,000 tons every three months. Because Conserv did not own production facilities, it did not manufacture the ammonia. Instead, it purchased the tonnage from the Mississippi Chemical Corporation. Ward said that Conserv insisted on establishing a final agreement at the convention because Taylor wanted to sell the ammonia before leaving the meeting.

The companies exchanged confirmations of the arrangement after the convention. On June 30, 1972, J. W. Venable, president of Conserv, wrote to Van Kleek:

* Senior District Judge of the Middle District of Georgia sitting by designation.

This will confirm our agreement to sell you 60,000 short tons of anhydrous ammonia during the period July 1, 1972–June 30, 1973.

The price agreed upon is $28.00/short ton at either one of the loading points, Pascagoula, Mississippi, or Donaldsonville, Louisiana. It is our intent that most of this production will come from the Donaldsonville plant.

It was further agreed that you would arrange to pick up this total tonnage in equal quarterly amounts of 15,000 tons. The payment term would be net 30 days.

Would you please issue us a confirming purchase order or contract for this tonnage.

Because Transammonia did not have a standard form for purchase contracts, it altered a standard sales form to provide Conserv with the requested documentation of the agreement.[1] Although the form provides blank spaces for its acceptance, Conserv did not execute the acceptance and did not return a copy of the form to Transammonia.

In July Mississippi Chemical developed production problems that prevented Conserv from delivering any ammonia in July, August, or September. The parties discussed this failure, but took no further action to solve it.

In early October, however, Conserv notified Transammonia that Mississippi Chemical would soon resume production. Venable communicated with Ward, who testified that they agreed to sales of 15,000 tons of ammonia every three months at the same price with a total quantity of 45,000 tons. The earlier failures of delivery were excused. Ward sent another standard form purchase contract to confirm the agreement, along with a cover letter that stated:

While the agreement calls for the shipment of 15,000 tons per quarter, it is understood that due to delay in securing the product, we may only be able to lift 10,000 tons during the period 10–15/12–31–72. You may be sure, however, that we will use our best efforts to move the material as scheduled.

I am certainly pleased that we were able to finally put this together and if the contract represents your understanding of our arrangement, kindly sign the original and return for our records.

In October and November Conserv delivered 15,036.43 short tons. It never acknowledged acceptance of the second standard form order.

In late November Mississippi Chemical again experienced production difficulties, the result of a natural gas shortage. Upon receiving notice of the problems, Ward requested a meeting with Venable and Taylor. During the conference, which occurred in early December, the Conserv representatives reportedly warned Transammonia only of the possibility of another cessation of its supply of ammonia.

Transammonia received no additional ammonia from Conserv. Although Conserv said it would continue its attempts to procure the tonnage from Mississippi Chemical, it did not attempt purchases from other producers. On February 8, 1973, Conserv returned the second confirmation purchase order to Transammonia and said that it held out no hope for future deliveries. Although additional deliveries were not due until the end of the first quarter of 1973, Transammonia told Conserv on February 26 that Transammonia would have to protect its interests. According to Ward, it made cover purchases for the 30,000 undelivered tons on February 14, March 2, April 10, and April 17. Because the natural gas shortage had driven up the price of ammonia, Transammonia paid from $40 to $60 a ton in

---

1. The alteration of the form was not complete. For example, the bottom of the face of the form stated, "This contract will not be binding on seller unless accepted and returned within thirty days from date hereof." The word "seller" was not changed to "purchaser". No alterations occurred in the small print on the back of the form entitled "Terms and Conditions of Sale". Because Transammonia did not sell the ammonia in this transaction, the jury could have reasonably inferred that the "Terms and Conditions" did not apply to the sale. Point four of the small print, for instance, limits the warranties granted by the seller, a reasonable term to be suggested by the seller but not by the buyer of the ammonia.

these transactions and therefore claimed cover damages of $632,731.43 plus interest.

Conserv disputes the Transammonia interpretation of several of the transactions between the two companies. Despite the June 30 confirmation letter, Taylor testified that the discussions at the convention were merely negotiations and that the parties never established a binding contract in June. He explained that Conserv would never have agreed to a contract without a contingency clause for relief from liability similar to a clause in the Conserv-Mississippi Chemical contract. Conserv contends that it did not accept the first purchase order to Transammonia because of the absence of this provision.

When the ammonia became available from Mississippi Chemical in October, Conserv says it offered to sell only the 15,000 tons later delivered, not 45,000 tons for delivery over the next nine months. According to Venable, the transaction constituted a one-time spot sale. The defendant therefore did not accept the second purchase order and contends that no contract existed for future sales.

Conserv also disputes the substance of the December meeting. When Mississippi Chemical notified it of renewed production problems, the defendant submits, it told Transammonia not to expect any further deliveries. At the meeting, Conserv concedes, it offered to continue to attempt to procure the chemical. But it insists that it stressed the certainty of the expected interruption of supply.

Based on this evidence, the district court rejected both parties' motions for directed verdicts. It submitted the case to the jury, which returned a general verdict in favor of the plaintiff and set damages at $95,575. After the district court entered judgment on the jury verdict and denied the motions for judgments notwithstanding the verdict, both parties appealed.

## II.

■ To overturn the jury's imposition of liability, Conserv asserts two objections to the conclusion, implicit in the general verdict, that a contract existed between the companies.[2]

First, the defendant argues that the district court incorrectly instructed the jury that the plaintiff bore only the burden to prove the existence of an oral contract by a preponderance of the evidence. Conserv cites *Sultan v. Jade Winds Construction Co.,* Fla.App.1973, 277 So.2d 574, for the proposition that Florida requires plaintiffs to prove the existence of oral agreements "by . . . more than a preponderance of the evidence. The evidence should be clear, full, and free from suspicion". *Id.* at 576.

■ Although the defendant correctly asserts that Florida law controls issues of burden of proof in diversity cases,[3] the district court did not misconstrue Florida law in this case. In *Sultan* the oral agreement changed a written employment contract not covered by the Florida Uniform Commercial Code. Despite the changes, the employee asserted that the oral agreement included the termination clause of the earlier written contract. The court held that the employee faced a burden of proving the inclusion by more than a preponderance of the evidence, basing its decision on a case involving an oral real estate lease, also not covered by the UCC, *Alexander v. Bess,* 1936, 123 Fla. 713, 167 So. 533.

■ Florida courts have never directly addressed the question of the burden of proof required for the recognition of oral contracts covered by the UCC; *Sultan* and

2. In oral argument the defendant dropped its contention that the Florida statute of frauds, Fla.Stat.Ann. § 672.2–201, prevented the enforcement of the alleged oral contract. Under section 672.2–201(2) the confirmatory purchase orders sent by Transammonia satisfy the requirements of the statute. *I. S. Joseph Co. v. Citrus Feed Co.,* 5 Cir. 1974, 490 F.2d 185, 188.

3. *Palmer v. Hoffman,* 1943, 318 U.S. 109, 117, 63 S.Ct. 477, 87 L.Ed. 645, *rehearing denied* 318 U.S. 800, 63 S.Ct. 757, 87 L.Ed. 1163; *Cities Service Oil Co. v. Dunlap,* 1939, 308 U.S. 208, 212, 60 S.Ct. 201, 84 L.Ed. 196; *Fidelity & Cas. Co. v. Funel,* 5 Cir. 1967, 383 F.2d 42, 45, *cert. denied,* 390 U.S. 1024, 88 S.Ct. 1410, 20 L.Ed.2d 281.

*Alexander* do not control the determination of this issue. In adopting the UCC, the Florida legislature apparently intended to adopt a preponderance standard for cases covered by the Code. In section 671.1–201(8) the "burden of establishing" a fact is defined as "the burden of persuading the triers of fact that the existence of the fact is more probable than its non-existence". As Sam G. Harrison, Jr., explains in the Florida Code Comments to section 671.1–201(8), this wording apparently intends to establish "the burden of ultimate persuasion" by a preponderance of the evidence. The sections on oral agreements indicate no intention to deviate from the general standard. Until the Florida courts decide otherwise, then, we will continue to approve jury instructions that do not impose a heavier burden. *See I. S. Joseph Co. v. Citrus Feed Co.,* 5 Cir. 1974, 490 F.2d 185, 188.

Second, Conserv submits that it should have received a directed verdict because the facts did not establish the existence of an oral contract. It argues that essential terms could not be identified on the evidence before the jury, that the date of effectiveness was uncertain, and that the parties never agreed on details of the contract. Under the Florida UCC, however, these facts do not compel reversal.

■ The Code does not require great specificity in contract formation. Under section 672.2–204 the parties may establish a contract "in any manner sufficient to show agreement"[4] and may leave open one or more terms as long as "a reasonably certain basis for giving an appropriate remedy" exists.[5] Every detail need not be specified by the parties nor proved in court. The moment of contract formation need not be ascertained.[6] Consequently, the fact that the date of the effectiveness of the Transammonia-Conserv contract is unclear or that certain contract details remain unresolved does not require a directed verdict as long as sufficient evidence exists of the agreement and of the basis for granting a remedy.

■ *I. S. Joseph* demonstrates evidence of an agreement and of terms sufficient to create a jury question in federal court[7] under the Florida UCC. According to the plaintiff, I. S. Joseph Co., one of its representatives reached oral agreements with a representative of the defendant, Citrus Feed Co., for the sale of 10,000 tons of citrus pulp. The I. S. Joseph representative testified that the agreements were unconditional. The Citrus representative testified that the sales related only to any excess production that Citrus might accumulate. I. S. Joseph issued three confirming purchase orders for the pulp, none of which was acknowledged by Citrus. Joseph also advised the defendant by letter that Joseph had sold the 10,000 tons to a foreign purchaser. Citrus argued that the confirmations and letter could be read consistently with its position. Given this factual dispute, the district court refused to direct a verdict, and this Court affirmed.

■ Here, the parties present a similar factual dispute. Transammonia representatives testified that they reached an oral agreement with Conserv at the convention for the sale of 60,000 tons of ammonia of designated purity at $28 a ton, FOB buyer's vessel. Furthermore, they testified that the parties modified the agreement in October by reducing the aggregate tonnage to 45,000 tons. Conserv denied the existence of either the contract or the modification. It interpreted the June transaction as negotiations and the October deal as a one-time spot sale. Transammonia issued confirming

---

4. Fla.Stat.Ann. § 672.2–204(1).

5. *Id.* at § 672.2–204(3).

6. *Id.* at § 672.2–204(2).

7. Although this is a diversity case, federal law determines the quantum of evidence necessary to withstand a motion for directed verdict. *Boeing Co. v. Shipman,* 5 Cir. 1969, 411 F.2d

365, 368 (en banc). *Boeing* requires district courts to overrule motions for directed verdicts and to submit cases to juries:

if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions  . . . . .

purchase orders consistent with its position. Conserv never accepted the orders and ultimately returned the October order unsigned. Transammonia also submits that at the December meeting Conserv learned of Transammonia's resale of the 45,000 tons. Thus a factual dispute strikingly similar to the *I. S. Joseph* controversy arose before the district court. If the testimony and memoranda of Transammonia were believed, the jury could reasonably have found that the agreements existed. The evidence also included more than enough terms of the agreements to provide a remedy: product, quantity, price, due dates, and FOB delivery terms.[8] The district court therefore correctly denied Conserv's motion for a directed verdict.

### III.

Transammonia submits that it should have been granted a directed verdict on damages for a substantially higher amount than the jury award. It argues that Florida UCC sections 672.2–711 and –712 permit a buyer of goods to cover his loss after a seller's breach of contract by purchasing the goods elsewhere and receiving as damages the difference between the purchase price and the contract price. The right to cover allegedly vested in this case on February 8 when Conserv returned the purchase order. By beginning the cover purchases six days later in the regular market for ammonia, Transammonia submits that it met the reasonableness requirements of section 672.2–712(1) and should have received the damages outlined in 672.2–712(2).[9] Because the cover purchase price clearly set the amount of damages, the plaintiff concludes that the district court should have awarded that

amount without consideration of the figure by the jury. The conclusion is supported by citation to *Polaroid Corp. v. Schuster's Express, Inc.*, 1 Cir. 1973, 484 F.2d 349.

■ Both the argument and the use of *Polaroid* must be rejected because the plaintiff ignores two factual disputes that create jury questions with regard to damages. First, the parties dispute the date on which the breach of contract occurred. Transammonia sets it at February 8. Conserv says that any contract found to exist in June was breached in July and any agreement in October was breached at the December meeting. This disagreement relates to damages because section 672.2–712 requires cover purchases to occur "without unreasonable delay". The delay, of course, will be determined from the date of breach. Because reasonable men could differ over when the breach occurred, the right to cover and therefore to collect cover damages depends on a factual issue that the district court correctly submitted to the jury.

■ Second, the parties dispute whether any delay in cover purchases was reasonable as required by section 672.2–712(1). As this Court said in *Owens v. Clow Corp.*, 5 Cir. 1974, 491 F.2d 101, 104, whether a plaintiff has made his cover purchases in a reasonable manner poses a "classic jury issue". If the jury had decided the breach occurred in December, it could have reasonably concluded that a two-month delay before the first cover purchase and a four-month delay before the last were unreasonable in a fluctuating market upset by natural gas shortages.

These two factual disputes also provide the basis for distinguishing *Polaroid*.

---

**8.** As long as the quantity term was clearly established, several cases have found binding contracts despite the absence of precise price terms, *Gaddis v. United States*, S.D.Miss.1971, 330 F.Supp. 741; *Cornelius v. Crea*, Sup.Ct. 1969, 33 A.D.2d 887, 307 N.Y.S.2d 521, *rev'd on other grounds*, 27 N.Y.2d 339, 318 N.Y.S.2d 133, 266 N.E.2d 815; *Southwest Engineering Co. v. Martin Tractor Co.*, 1970, 205 Kan. 684, 473 P.2d 18.

**9.** Fla.Stat.Ann. § 672.2–712 states in part:
(1) After a breach within the preceding section the buyer may "cover" by making in

good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.
(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (§ 672.2–715), but less expenses saved in consequence of the seller's breach.

There, the plaintiff claimed damages under the Interstate Commerce Act for the loss of property hijacked while entrusted to the defendant, a common carrier. The court concluded that the question whether damages should be measured by dealer price or manufacturer cost was a legal issue. The holding did not address the question whether the plaintiff had acted reasonably or whether a material event occurred on one date or another. The question in *Polaroid* was a legal one because the parties disputed no facts relevant to the selection of the measure of damages. Here, on the other hand, the parties created a two-fold factual controversy that controlled the choice of the measure of damages. If the contract were breached early and the resulting delay were unreasonable, the cover purchase prices could not properly measure Transammonia's damages. If the delay were considered reasonable, however, the purchase prices could have provided the basis for the calculation. The district court properly explained this distinction to the jury and properly accepted its conclusion.

The judgment is AFFIRMED.