GOLD KIST INC., Plaintiff-Appellant,

v.

BASKIN–ROBBINS ICE CREAM
COMPANY, Defendant-Appellee.

No. 78–3774.

United States Court of Appeals,
Fifth Circuit.

Aug. 7, 1980.

Alston, Miller & Gaines, James S. Stokes, IV, Anne S. Rampacek, Atlanta, Ga., for plaintiff-appellant.

Kutak, Rock & Huie, Terrence L. Croft, C. Wilson DuBose, John R. Lowery, Atlanta, Ga., for defendant-appellee.

Before GOLDBERG, CHARLES CLARK and THOMAS A. CLARK, Circuit Judges.

CHARLES CLARK, Circuit Judge:

Just having Georgia on my mind is not enough to bring me within reach of the Georgia long-arm statute, argues Baskin-Robbins Ice Cream Company ["Baskin-Robbins"], a licensor of ice cream products. The district court agreed and granted Baskin-Robbins' 12(b)(2) motion to dismiss this claim by Gold Kist Inc., for Baskin-Robbins' alleged failure to accept delivery under its contract of 75,750 pounds of Georgia pecans. We find that Baskin-Robbins' activities in Georgia consisted of more than mere mental processes, that the district court erroneously interpreted the statute, and that the exercise of jurisdiction over Baskin-Robbins does not offend due process. We therefore reverse and remand.

I

Gold Kist Inc., is a farmers' cooperative association incorporated and existing under the Cooperative Marketing Act of the State of Georgia, with its principal place of business in Atlanta, Georgia. Baskin-Robbins is a Delaware corporation with its principal place of business in Burbank, California.

In 1975 Baskin-Robbins was considering using Gold Kist as a supplier of pecans. Norman J. Klipfel, Baskin-Robbins' Vice President of Production Resources, and Tomah Bill Williams, National Production Manager, traveled to Gold Kist's pecan processing plant in Waycross, Georgia, to determine whether that plant met Baskin-Robbins' requirements with regard to sanitation, quality control, and processing methods, and in other respects. Ernie Sharp, a consultant to Baskin-Robbins, and Richard E. Kelm of Sullivan Sales, Inc., a food broker for Gold Kist, accompanied Klipfel and Williams on their inspection visit. Klipfel and Williams inspected the plant in the morning and discussed with Rick Bronaugh, Gold Kist's plant manager, and James M. Smith, Pecan Division Sales Manager, the quantities and sizes of pecans that Gold Kist could supply Baskin-Robbins. They also talked about the changes that Gold Kist would have to make in its plant before Baskin-Robbins would approve Gold Kist as a supplier of pecans. While Klipfel and Williams were at Gold Kist's Waycross plant, Smith agreed on behalf of Gold Kist to make the requested changes.

Sullivan Sales acted as broker for two contracts between Gold Kist and Baskin-Robbins for the purchase of pecan halves and pieces. The first contract was executed in February 1976; the second contract, No. 765 (the one giving rise to this lawsuit), in December 1976. Gold Kist proposed the terms of the contract to Kelm at Sullivan Sales' office in Detroit, Michigan, and Kelm then communicated those terms to Sharpe, who was in Detroit or Evansville, Indiana, during most of the discussions. Sharpe would then convey these terms to Baskin-Robbins in Burbank, California. Smith executed the contract in Gold Kist's Waycross, Georgia, office and forwarded it to Kelm, who delivered it to Baskin-Robbins' office in Burbank.

Under the terms of the contract, Baskin-Robbins agreed to purchase 350,000 pounds of pecan halves and pieces from Gold Kist. In January 1977, Baskin-Robbins called Sullivan Sales and requested that the amount

purchased under contract No. 765 be reduced from 350,000 pounds to 200,000 pounds. Sullivan Sales called James L. Dendy, Jr., Gold Kist's Pecan Division Manager, at Gold Kist's Georgia office. Dendy agreed to the request and Sullivan Sales communicated that agreement to Baskin-Robbins.

Baskin-Robbins instructed Sullivan Sales to accept orders for pecans covered by contract No. 765 from certain designated companies, one of which was Kinnett Dairies, Inc., in Columbus, Georgia. Kinnett Dairies processes milk and manufactures ice cream, some to Baskin-Robbins' specifications. Kinnett Dairies sells that ice cream to its wholly-owned subsidiary, Colonial Ice Cream Company ["Colonial"], which is the area franchisor for Baskin-Robbins. Colonial has exclusive rights to create Baskin-Robbins franchises in Georgia, Florida, South Carolina, and a portion of Alabama. The parties stipulated that there are forty "Baskin-Robbins 31 Ice Cream Stores" in the State of Georgia. These retail stores are not owned by Baskin-Robbins but are independent franchises granted by Colonial, although Baskin-Robbins does supply the forms for and approves each individual franchise agreement, provides merchandising and technical assistance, and prescribes strict rules and regulations for the specific operation of the individual retail franchises as well as for the conduct of the area franchisor's business.

Baskin-Robbins does not directly receive any revenue from the retail sales of ice cream. Rather, it receives a designated amount of money for each gallon of ice cream that Colonial sells to any of its franchisees. All of that ice cream, regardless of where consumed, is manufactured by Kinnett Dairies at its plant in Columbus, Georgia. Colonial, based in Columbus, has offices in Atlanta, Georgia, and Fort Lauderdale, Florida. The record does not reveal the share of Colonial's sales made by each office or the proportion of total sales in each state in its region. The parties stipulated, however, that Baskin-Robbins received "a substantial amount of money" based on sales by Colonial to franchisees within the State of Georgia.

After Gold Kist shipped a total of 124,250 pounds of pecans from its Waycross plant under the terms of contract No. 765, including ten shipments to Kinnett Dairies, Baskin-Robbins refused to accept delivery of the remaining 75,750 pounds. Gold Kist then sued Baskin-Robbins in the Northern District of Georgia for breach of contract. Baskin-Robbins moved to dismiss under Rule 12(b)(2) for lack of personal jurisdiction, asserting that it had transacted insufficient business in Georgia to permit the exercise of jurisdiction over it under the Georgia Long-Arm Statute, Ga.Code Ann. § 24–113.1(a) (1971). The district court granted the motion and Gold Kist appealed.

## II

In a diversity action, a federal court may assert jurisdiction over a nonresident defendant only to the extent permitted by the long-arm statute of the forum. *Washington v. Norton Manufacturing, Inc.,* 588 F.2d 441, 444 (5th Cir.), *cert. denied,* 442 U.S. 942, 99 S.Ct. 2886, 61 L.Ed.2d 313 (1979); *Product Promotions, Inc. v. Cousteau,* 495 F.2d 483, 489 (5th Cir. 1974); *Arrowsmith v. United Press International,* 320 F.2d 219 (2d Cir. 1963). Of course, regardless of the breadth of the state statute, the exercise of jurisdiction over a defendant must comport with the basic requirements of the due process clause of the fourteenth amendment. We first examine whether the Georgia long-arm act supports the exercise of jurisdiction over Baskin-Robbins. If it does, we must then determine whether such an assertion of jurisdiction is consistent with due process.

### A. *The Georgia Long-Arm Act*

The Georgia Long-Arm Act, Ga.Code Ann. § 24–113.1, provides in pertinent part:

A court of this State may exercise personal jurisdiction over any nonresident . . . as to a cause of action arising from any of the acts, omissions, ownership, use or possession enumerated in this section, . . . if in person or through an agent, he:

(a) Transacts any business within this state . . . .[1]

■ The words of the statute, taken literally, might appear to restrict the Georgia courts' exercise of jurisdiction to less than that permitted by due process, for the statute requires that the cause of action "arise from" the transaction of business "within the State."[2] We do not interpret the act on a clean slate, however. We are bound by all the law of the forum state, including interpretations by its courts. *Wilkerson v. Fortuna Corp.*, 554 F.2d 745, 747–48 (5th Cir.), *cert. denied*, 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977). We turn first to the pronouncements of the Georgia courts.

· It is clear that since 1973 the Georgia Supreme Court has interpreted the long-arm statute liberally. Gold Kist argues that the Georgia Supreme Court has declared the reach of the long-arm act to be coextensive with that permitted by due process, pointing to the following language: "[T]he Long-Arm Statute contemplates that jurisdiction shall be exercised over non-resident parties to the maximum extent permitted by procedural due process." *Coe & Payne Co. v. Wood-Mosaic Corp.*, 230 Ga. 58, 60, 195 S.E.2d 399, 401 (1973). Moreover, that language has been frequently reiterated by subsequent courts. *See, e. g., Brooks Shoe Manufacturing, Inc. v. Byrd*, 144 Ga.App. 431, 432, 241 S.E.2d 299, 300–01 (1977); *Cox v. Long*, 143 Ga.App. 182, 237 S.E.2d 672, 673 (1977). *See also Shingleton v. Armor Velvet Corp.*, 621 F.2d 180 at 182 (5th Cir. 1980).

The defendant contends that it is only subsections (b) and (c) of § 24–113.1, which apply to tort actions, that Georgia courts have interpreted to be coextensive with due process. Although it is true that the courts have been most emphatic in their expansive reading of the long-arm act in the tort cases under subsections (b) and (c), they have at least implicitly extended the reach of subsection (a) to the limits of due process as well. In *Brooks Shoe Manufacturing*, the plaintiff's action involved both breach of contract and tort. In purporting to extend jurisdiction to the limits of due process, the court made clear that it interpreted only § 24–113.1(a), finding it unnecessary to interpret subsections (b) and (c). 144 Ga.App. at 433, 241 S.E.2d at 301. Moreover, such an interpretation is consistent with the Georgia Supreme Court's holding in *J. C. Penney Co. v. Malouf Co.*, 230 Ga. 140, 143, 196 S.E.2d 145, 148 (1973), in which the court equated "transacting any business" in Georgia, under subsection (a) of the long-arm statute, with the "requirement of due process." Our holding in *Swafford v. Avakian*, 581 F.2d 1224 (5th Cir. 1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979), is not to the contrary, as Baskin-Robbins would have it. In *Swafford* we stated, "Activity under subsection (a) must be more extensive than activity which will support a finding of a 'contact' with Georgia for the purpose of exercising jurisdiction in a tort claim under subsection (b). *Shellenberger v. Tanner*, 138 Ga.App. 399, 227 S.E.2d 266, [276] (1976)." 581 F.2d at 1226. The *Shellenberger* court, as well as the *Swafford* court, was merely making the point that an isolated act that may constitute a "contact" if it leads to a tort may not rise to the level of "transacting business" when jurisdiction is based on contract. But this result obtains as readily under the due process clause as under the Georgia long-arm act.

Our application of § 24–113.1 to the facts of this case need not rely on our equating

1. Subsections (b) and (c) allow a court to assert jurisdiction based on tortious acts; subsection (d) is based on use or possession of real property. Gold Kist alleged jurisdiction only under subsection (a).

2. If strictly construed, the requirement that the claim arise out of the business transacted in the state would be more restrictive than those imposed by due process, for it is clear that "a nonresident may be required to defend an action in state court even though the suit bears no relation to the activities deemed necessary and sufficient to constitute minimum contacts." *Wilkerson v. Fortuna Corp.*, 554 F.2d 745, 750 (5th Cir.), *cert. denied*, 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977) (following *National Geographic Soc'y v. California Bd. of Equalization*, 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977).

its reach to the limits of due process, however. Baskin-Robbins rests its argument on the statutory requirements that the defendant "transact any business in Georgia" and that the claim "arise out of" the transaction of business in Georgia. Baskin-Robbins contends that it did not transact business in Georgia; even if its business with Kinnett Dairies constitutes a Georgia transaction, Gold Kist's claim does not arise out of that transaction, so that transaction is legally irrelevant.

■ The broad reading the Georgia courts have given to these terms will not support such an argument. The long-arm act confers jurisdiction over "actions, arising, either directly or indirectly, out of such transactions." *Brooks Shoe Manufacturing, Inc. v. Byrd*, 144 Ga.App. 431, 433, 241 S.E.2d 299, 301 (1977) (citing *Davis Metals, Inc. v. Allen*, 230 Ga. 623, 626, 198 S.E.2d 285, 287 (1973). The courts have even stated that the act confers jurisdiction where the claim merely "arises from or is *connected with* such act or transaction." *Davis Metals, Inc. v. Allen*, 230 Ga. 623, 626, 198 S.E.2d 285, 287 (1973) (emphasis added). In *Brooks Shoe Manufacturing*, the defendant had sent its agents to Georgia only three times, to appear at trade shows to assist in the solicitation of potential customers. The claim was based on the alleged breach of the employment contract between the parties and on the defendant's alleged interference with the plaintiff's solicitation of business and conversion of his customer list. The court upheld long-arm jurisdiction on this claim even though the defendant's activities at the trade shows did not give rise to the cause of action and were related to the plaintiff's claims only to the extent that the defendant engaged in the activities to further the economic benefit it derived from the contract sued upon. Clearly, Gold Kist's claim arises directly from its contract with Baskin-Robbins. Indeed, under the flexible test of *Brooks Shoe Manufacturing*, the action may arise from Baskin-Robbins' dealings with Kinnett Dairies, which after all created the need for Baskin-Robbins to establish an acceptable supplier of pecans.

■ Furthermore, the Georgia courts' understanding of "[t]ransacts any business within this State" has been equally liberal and encompasses Baskin-Robbins' entering into contract No. 765. The transacting of business in Georgia requires only that the defendant engage in a transaction as a result of some purposeful involvement with Georgia. This purposeful involvement establishes a " 'contact' with the forum itself and not just a connection with a resident plaintiff." *Shellenberger v. Tanner*, 138 Ga.App. 399, 407, 227 S.E.2d 266, 274 (1976). In elaborating on the nature of that "contact," the *Shellenberger* court went on to state:

> When a nonresident engages in some activity with or in the forum, even a significant single transaction, whether he be physically present there or not, and as a result business is transacted or a tortious injury occurs, a jurisdictional "contact" exists between that nonresident and the forum. But when the unilateral actions of a forum plaintiff merely involve or somehow relate to a nonresident who has in no way conducted some activity with or in the state, there may be a "connection" between the nonresident and the plaintiff but there is no "contact" between the nonresident and the forum such that jurisdiction will lie.

*Id.*

The cases illustrate how slight need be the defendant's activity in Georgia, as long as it is purposeful, to constitute transacting business in Georgia. The Georgia Supreme Court upheld jurisdiction over a nonresident defendant whose only contacts with Georgia were the shipment of its merchandise for delivery to the plaintiff in Georgia and the existence of a warranty-indemnity contract between the plaintiff and defendant. *J. C. Penney Co. v. Malouf Co.*, 230 Ga. 140, 196 S.E.2d 145 (1973). In *Brooks Shoe Manufacturing* the defendant's only connection with Georgia was to send representatives and officers to trade shows in Georgia during three consecutive years. It had no offices, warehouses, facilities, or other places of business in Georgia; it made its

shipments f. o. b. Pennsylvania; and payments were made by the customers directly to Pennsylvania. Yet, jurisdiction was upheld under the "transacting any business" subsection of the long-arm statute. 144 Ga.App. at 433, 241 S.E.2d at 301. More recently, the Georgia Court of Appeals ruled that if a nonresident corporation purposefully seeks to avail itself of business opportunities in Georgia, the resulting business transactions have the requisite connection with Georgia to sustain jurisdiction, regardless of whether the nonresident itself comes into the state or has agents or independent contractors effect this result. *Hollingsworth v. Cunard Line Ltd.*, 152 Ga. App. 509, 263 S.E.2d 190 (1979).

Baskin-Robbins seeks to rely on *O. N. Jonas Co. v. B & P Sales Corp.*, 232 Ga. 256, 206 S.E.2d 437 (1974). In *Jonas*, the Supreme Court of Georgia held that subsection (a) did not provide jurisdiction over a nonresident defendant whose only contacts with Georgia were that its agents had visited plaintiff's manufacturing plant in Georgia before the contract was entered into and that goods under the contract were shipped f. o. b. Georgia to points outside the state. *Jonas* cannot support the district court's view that a visit to the forum cannot constitute a "contact" for the purposes of § 24–113.1(a). In *Delta Equities, Inc. v. Larwin Mortgage Investors*, 133 Ga.App. 382, 211 S.E.2d 9 (1974), the court held squarely to the contrary. The nonresident defendant in *Delta Equities* had met with the plaintiff in California and in Florida, made two visits to Georgia to formulate a contract, and resolved the differences and closed the contract by telephone from California. The court upheld jurisdiction under § 24–113.1(a), noting that defendant's

> agents made two visits to Georgia to negotiate a contract. We harbor no question but that such negotiations constitute a significant contact in Georgia . . . Accordingly we hold that the negotiations within the confines of this state constituted the required "minimum contacts" necessary to hold that [defendant] was

"transacting business" within the intent of Georgia's Long Arm Statute . . . *Id.* at 384, 211 S.E.2d at 11.

The court of appeals relied on *Delta Equities* a year later in reversing a motion to dismiss for lack of jurisdiction over a defendant who had no officers, employees, or agents in Georgia, but one of whose officials had visited Atlanta for two days to direct and supervise the plaintiff's operations to ensure it met defendant's requirements. On that basis alone, the court of appeals held the defendant to be subject to the jurisdiction of the Georgia courts. *Shea/Rustin, Inc. v. Home Fashion Guild Ltd.*, 135 Ga.App. 88, 217 S.E.2d 405 (1975).

The visit by the Baskin-Robbins officials far more closely resembles those in *Delta Equities* and *Shea/Rustin* than it does that in *Jonas*. The *Jonas* court made clear that in that case "there were no negotiations or contracts entered into in Georgia with respect to the goods that are the subject matter of these actions." 232 Ga. at 258, 206 S.E.2d at 438. In this case, by contrast, Baskin-Robbins' agents came to Georgia where they entered into negotiations with Gold Kist and in fact required Gold Kist to make certain changes in its Georgia plant before entering into a contract. It is of no import that these negotiations predated an earlier contract than the one sued upon. Baskin-Robbins required that Gold Kist meet its standards and make all necessary changes before entering into *any* contract. Contract No. 765, as much as any other, was the result of Baskin-Robbins' purposefully engaging itself in Georgia commerce.

Moreover, Baskin-Robbins' other contacts on this contract are far more extensive than was true in *Jonas*. Baskin-Robbins designated certain parties within the State of Georgia for receipt of the goods purchased under the contract, so that part performance under the contract was to be effected in Georgia, by Baskin-Robbins' own choosing. Furthermore, contract No. 765 contains a choice-of-law provision calling for the application of Georgia law, which the Georgia Supreme Court has recognized as

invoking the protection of the law of Georgia and therefore a contact to be considered in determining the applicability of subsection (a). *Davis Metals*, 230 Ga. at 625, 198 S.E.2d at 287.

Any one of these contacts standing alone might or might not be sufficient to sustain the exercise of jurisdiction under § 24–113.-1(a). In any event, these contacts are not irrelevant to the determination whether the defendant has transacted any business in Georgia. Each one the Georgia courts have considered to be a relevant contact. Moreover, Baskin-Robbins' assertion to the contrary notwithstanding, the Georgia courts do consider the "totality of the circumstances": "We hold that under the totality of the circumstances there were sufficient contacts to confer personal jurisdiction over the nonresident defendant under § 24–113.-1(a)." *Brooks Shoe Manufacturing*, 144 Ga. App. at 433, 241 S.E.2d at 301.

Given the totality of the circumstances in this case, we have no doubt that the Georgia courts would hold that Baskin-Robbins had transacted business in Georgia within the meaning of § 24–113.1(a). We hold, therefore, that the Georgia long-arm act, as interpreted by the Georgia courts, does confer in personam jurisdiction over Baskin-Robbins in this action.

### B. *Federal Due Process*

Baskin-Robbins chose to address its argument to the interpretation of § 24–113.1(a) and dismissed any discussion of due process as irrelevant to its case. Nevertheless, the Georgia act, as interpreted, contains the requirement that the exercise of jurisdiction thereunder comport with due process.[3]

We briefly address the due process considerations in this case.

The test for determining whether due process permits the assertion of jurisdiction is twofold. First, the defendant must have certain minimum contacts with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). In other words, it must be fair to the defendant to require it to defend this lawsuit. Second, the defendant must "purposefully [avail] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). The latter test is easily met here, for Baskin-Robbins has purposefully conducted activities in Georgia by seeking to enter into and profit from the stream of commerce in Georgia through the ultimate marketing of its ice cream, of which the procurement of pecans from Gold Kist was a part.[4] We need only inquire, then, whether Baskin-Robbins has sufficient minimum contacts with Georgia for it to be fair and reasonable to require it to defend Gold Kist's claim.

Mr. Justice Stone set out in *International Shoe* the four general relations between an entity's contacts with the forum and the claim it is called upon to defend:

"Presence" in the state in [the due process] sense has never been doubted when the activities of the corporation there have not only been continuous and

---

**3.** E. g., "Under our Long Arm Statute jurisdiction over a nonresident exists on the basis of transacting business in this state if the nonresident has purposefully done some act or consummated some transaction in this state, if the cause of action arises from or is connected with such act or transaction, and if the exercise of jurisdiction by the courts of this state does not offend traditional fairness [sic] and substantial justice." *Davis Metals, Inc. v. Allen*, 230 Ga. 623, 625, 198 S.E.2d 285, 287 (1973).

**4.** Additionally, the contract between Baskin-Robbins and Gold Kist contained a choice-of-

law provision calling for the application of Georgia law. Such a provision is a purposeful availment of the benefits and protections of Georgia law, for it not only selects the Georgia rules of decision but also reposes trust in the legislature and courts of Georgia in wisely shaping the law during the entire period in which the contract is to be in force. We need not decide, however, given Baskin-Robbins' plethora of contacts with Georgia, whether a Georgia choice-of-law provision is a relevant "contact" for due process analysis.

systematic, but also give rise to the liabilities sued on . . . . Conversely it has been generally recognized that the casual presence of the corporate agent or even his conduct of single or isolated items of activities in a state in the corporation's behalf are not enough to subject it to suit on causes of action unconnected with the activities there. . . .

. . . [T]here have been instances in which the continuous corporate operations within a state were thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities. . . .

Finally, . . . the commission of some single or occasional acts of the corporate agent . . . , because of their nature and quality and the circumstances of their commission, may be deemed sufficient to render the corporation liable to suit.

326 U.S. at 317–18, 66 S.Ct. at 159.

■ Here there can be no doubt that Baskin-Robbins is amenable to jurisdiction in Georgia on this claim, for its contacts with Georgia in controlling the manufacture, distribution, and marketing of its products throughout the state are legion. We need not test whether Baskin-Robbins' activities in Georgia are so continuous and systematic as to give rise to general jurisdiction, that is, to render it amenable to suits entirely unrelated to its activities in Georgia. On the other hand, this is not a case in which the defendant committed only a single act in the forum state. Not only did Baskin-Robbins enter into a contract with Gold Kist in Georgia [5] but it also entered into a contract with Colonial Ice Cream Company, its area franchisor for the State of Georgia (and other areas). Pursuant to that contract, Colonial entered into franchise agreements with numerous franchisees in the State of Georgia, over which Baskin-Robbins exercises a substantial degree of control and from which Baskin-Robbins derives a substantial amount of money.[6]

Moreover, Gold Kist's claim, although it does not arise directly out of Baskin-Robbins' contract with the area franchisor, Colonial, nonetheless clearly arises out of the general course of business engendered by Baskin-Robbins' dealings with Colonial and the franchisees. By engaging to have its ice cream sold in Georgia, Baskin-Robbins knew that unless Georgians should suddenly lose their yearning for pecans in ice cream, it was going to have to procure a supplier of pecans. It is scarcely surprising that it chose to do so from a Georgia supplier. As part of its supervision over the manufacture and marketing of ice cream, Baskin-Robbins specified Gold Kist as a supplier and subjected it to requirements to ensure the maintenance of quality.

Because of the extensive nature of the operations it instigated and the supervision it chose to exercise over these operations, Baskin-Robbins could foresee that it might be called upon to defend in a Georgia forum based on some aspect of these operations, or that it might seek recourse to the Georgia courts to enforce these obligations. Be-

---

**5.** Baskin-Robbins' contract with Gold Kist constitutes the transaction of business in Georgia for due proces purposes, regardless of how it is considered for state long-arm purposes. As Professor Moore has stated, "To conduct business in a state, it is not necessary that a representative of the defendant ever have been physically present therein. Business is transacted in the state when the obligations created by the defendant, or business operations of the defendant, have a realistic impact on the commerce of the state and the defendant has purposely availed itself of the opportunity of acting there and should reasonably have foreseen that the transactions would have consequences there." 2 Moore's Federal Practice ¶ 4.25[5], at 260 n.4. As we have set out earlier, it was clearly the hope of Baskin-Robbins that this contract would have significant effects on Georgia commerce.

**6.** Baskin-Robbins' royalties are not based directly on the retail sales by the franchisees, it is true. Baskin-Robbins receives a royalty measured by the gallons of Baskin-Robbins ice cream sold by Colonial to its franchisees. As the exclusive area franchisor, Colonial is the only source from which the retail franchisees can obtain their ice cream. Baskin-Robbins receives greater revenues as the sales of its ice cream in Georgia increase.

cause it further elected to do business with a Georgia supplier of pecans for delivery to a Georgia dairy, for manufacture into ice cream to be sold to its area franchisor in Georgia, to be further resold to its many franchisees in Georgia and consumed by Georgians, its involvement with the State of Georgia is manifest. It works no unfairness on Baskin-Robbins to compel it to defend this action. The application of the Georgia long-arm act in this instance does not offend the requirements of due process.

### III

We hold that the district court erred in ruling that Ga.Code Ann. § 24–113.1(a) does not authorize the exercise of jurisdiction over Baskin-Robbins on this claim. Moreover, that exercise comports with constitutional requirements. We reverse the judgment dismissing the action and remand the case to the district court.

REVERSED AND REMANDED.