**AMERICAN CARPET MILLS, Division of Keller Industries, Inc., Plaintiff-Appellee,**

v.

**The GUNNY CORPORATION, Defendant-Appellant.**

No. 80–7435.

United States Court of Appeals, Fifth Circuit. Unit B

July 6, 1981.

Gershon, Ruden, Pindar & Olim, Jay E. Loeb, Atlanta, Ga., for defendant-appellant.

Chamlee, Dubus, Sipple & Walter, Lamar C. Walter, Savannah, Ga., for plaintiff-appellee.

Before MORGAN, RONEY and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

This case arises from an admitted breach by appellant The Gunny Corporation [Gunny] of a contract to supply jute to appellee American Carpet Mills [American].[1] In the court below, the jury returned a verdict in favor of appellee, awarding damages and attorney fees. Gunny here contends, *inter alia*, that the court lacked venue and that the evidence was insufficient to support the jury's award of cover damages. We conclude that the district court was not in error and that the evidence supported the jury's verdict. Consequently, we affirm.

### I. *Facts*

Gunny, a New York corporation with its principal place of business in New York, employs three persons, two in New York and the third, V. N. Kedia, in Georgia. Kedia, secretary of the corporation, resides in Georgia and oversees Gunny's business in that state, conducting such business out of

---

1. *Bigelow-Sanford v. Gunny Corp.,* 5th Cir., 649 F.2d 1060, also decided today, involves a similar set of facts.

both his home in Marietta and the offices of Blue Heaven Mills, a separate business entity, in Cartersville. According to testimony given at trial, Kedia is both president of Blue Heaven Mills and the controlling figure in Gunny. Gunny's president, Phillip Raymond, is also associated with Blue Heaven Mills.

Gunny purchases jute in India and ships it to Savannah, where stevedores unload it and place it in transit sheds maintained by the Georgia Ports Authority. Upon instructions from Gunny, the Ports Authority then delivers the jute to the buyer, in this instance American, who arranges for further transportation of the jute. In order to solicit sales of jute to carpet manufacturers in Georgia, Gunny retained as its exclusive agent in the state Crutchfield & Co. of Dalton, Georgia. Drennon Crutchfield, as Gunny's sales agent,[2] made such sales on a commission basis, obtaining Kedia's approval of all negotiations. In this manner, Crutchfield negotiated the contract with American sued upon here.

American Carpet Mills is a division of Keller Industries, Inc., a foreign corporation with its principal place of business in Miami, Florida. American has a carpet tufting facility in Cartersville, Georgia, and a dye facility in Rome, Georgia. In November 1978, Raymond Hanks, a general manager of the Cartersville facility, negotiated a contract with Crutchfield for the purchase from Gunny of 400,000 linear yards of jute at $.635 per linear yard with delivery f. o. b. Savannah in the first quarter of 1979. American prepared the purchase order and sent it to Crutchfield who in turn forwarded it to Gunny and mailed a confirmation to American. Gunny then prepared and executed a sales contract, mailing it from New York to Cartersville. American executed the contract and returned it to New York.

Of the 400,000 yards of jute specified in the contract as due for delivery during the first quarter of 1979, American received only 108,002 yards.[3] During the first quarter contract period, however, Kedia advised Crutchfield that Gunny had additional jute being delivered to Savannah. In fact, Raymond testified at trial that Gunny received 1.8 million yards of jute in Savannah during this period. The jury specially found that Gunny breached its contract with American on February 27, 1979.[4]

In January and February, Steven Findley, American's office manager and bookkeeper, requested of Raymond that Gunny make further deliveries pursuant to the first quarter contract. After Gunny failed to make such deliveries, American began, in March, to purchase jute on the spot market, the only source of jute then extant. By the end of August 1979, it had purchased 444 rolls of jute[5] in this manner in substitution for the jute Gunny had failed to supply at prices ranging from $.675 to $1.28 per linear yard.

The court submitted all issues to the jury. Returning special verdicts, the jury found that Gunny had breached its contract and that American had purchased jute in good faith in substitution for the jute ordered from Gunny and had saved no expenses as a result of Gunny's default. Using the difference between the contract price and the cost of cover purchases to measure damages, the jury awarded American $84,600. The court denied both Gunny's motions for judgment notwithstanding the verdict and, in the alternative, for a new trial.

Gunny challenges the judgment on the grounds that: 1) venue was lacking in the Southern District of Georgia where the case was tried, 2) the alleged cover purchases should not have been used to measure damages for various reasons including, *inter alia*, that they were not in substitution for the contract purchases, were not made seasonably and in good faith, and were not shown to be due to Gunny's breach, and 3)

---

2. Kedia appointed Crutchfield to this position.

3. American received this jute in December 1978.

4. As stated *supra*, Gunny does not appeal this finding.

5. Each roll contains approximately 66.7 linear yards.

the district court improperly denied a request for instructions regarding expenses saved by Gunny's alleged breach. We address each of these contentions in turn.

## II. *Venue*

28 U.S.C. § 1391, setting out the general rules of venue, provides in part:

(a) A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in the judicial district where all plaintiffs or all defendants reside, or in which the claim arose.

Gunny argues that the district court erred in finding venue in that the claim did not arise in the Southern District of Georgia and, alternatively, that even if it did, that district was an inconvenient forum. In so arguing, Gunny adamantly points to *Leroy v. Great Western United Corp.,* 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979). In *Leroy,* Great Western brought suit in a federal district court of Texas challenging an Idaho statute imposing restrictions on certain purchases of stock in corporations having substantial assets in Idaho.[6] The Supreme Court held, agreeing with the district court, that venue did not exist in Texas as the claim arose in Idaho. In dicta, the Court also stated that in the "unusual case in which it is not clear that the claim arose in only one specific district," the plaintiff should choose between districts with an eye to the availability of witnesses, the accessibility of other relevant evidence and the convenience of the defendant. We conclude that this, like *Leroy,* is noit the unusual case. As Gunny admits, in an action for breach of contract, venue is proper at the place of performance. *See* 1 Moore's *Federal Practice* § 0.142[5–2]; *Ryan v. Glenn,* 52 F.R.D. 185 (D.C.Miss.1971). Since the contract did not stipulate place of performance and Gunny had breached the contract

by failing to deliver the jute to American in Savannah, Savannah was the locus of performance. While the Eighth Circuit in *Gardner Engineering Corp. v. Page Engineering Co.,* 484 F.2d 27, 33 (8th Cir. 1973) noted that "there is very little law on this precise issue," it concluded that venue at the place of performance was proper.[7] In *Gardner,* defendant, a subcontractor, had breached the contract by failing to deliver materials and equipment to plaintiff contractor. From this, the court concluded that the place of performance was the site at which delivery was to be made and that venue therefore existed in that district.[8] This conclusion accords with those of other courts addressing the issue, place of performance being the site of delivery. *Keco Industries, Inc. v. ACF Industries, Inc.,* 316 F.2d 513 (4th Cir. 1963); *Victorson v. Albert M. Green Hosiery Mills, Inc.,* 202 F.2d 717 (3d Cir. 1953). Since we conclude that American's claim arose in only one location, Savannah, the place of performance, we need not address Gunny's contention that that forum was inconvenient.

## III. *Cover Purchases*

Gunny next contends that appellee's alleged cover purchases should not have been used to measure damages in that they were not made in substitution for the contract purchases, were not made seasonably or in good faith, and were not shown to be due to Gunny's breach. Again, we find Gunny's argument unpersuasive. *Ga. Code Ann.* § 109A–2–711 (U.C.C. § 2–711) provides for cover damages where the seller fails to make delivery or repudiates the contract. Section 109A–2–711 provides in pertinent part:

(1) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods in-

---

6. Great Western is a publicly owned Delaware corporation with executive headquarters in Texas and corporate offices in Colorado.

7. The court cited *Deering Milliken Research Corp. v. Textured Fibers, Inc.,* 310 F.Supp. 491, 500 (D.C.1970); *Ryan v. Glenn,* 52 F.R.D. 185 (N.D.Miss.1971).

8. Gunny agrees that venue exists at the place of performance but would have us believe that the place of performance is the site of payment. We find no cases, in which the parties had contractually stipulated to that effect supporting that proposition.

volved, and with respect to the whole if the breach goes to the whole contract (109A2–612), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid

(a) "cover" and have damages under the next section as to all the goods affected whether or not they have been identified to the contract . . . .

Title 109A2–712 (U.C.C. § 2–712) defines cover:

(1) After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (109A–2–715), but less expenses saved in consequence of the seller's breach.

(3) Failure of the buyer to effect cover within this section does not bar him from any other remedy.

The district court submitted the question of damages to the jury using a special verdict. This was proper; the question is one of fact. As we held in *Transammonia Export Corp. v. Conserv, Inc.*, 554 F.2d 719, 724 (5th Cir. 1977), "whether a plaintiff has made his cover purchases in a reasonable manner poses a classic jury issue." The jury found that Gunny had breached, American had covered, and had done so in good faith without unreasonable delay by making reasonable purchases, and was therefore entitled to damages under § 2–712.[9] Gunny's argument that American was not entitled to such damages[10] consequently fails in that sufficient evidence supported the jury's verdict.

*IV. Damages Instruction*

 Gunny also sought a jury instruction to the effect that expenses saved be deducted from damages. The court refused such charge on the ground that there was no evidence in the record of any cost savings. No such evidence was present; the ruling was not error.

Accordingly, we AFFIRM the judgment.

---

9. American's cover purchases were made in March, May, June, July, August and September. Although the record does not reveal whether American could have purchased the entire amount in March, it does show that the price on the spot market declined steadily after March. Any delay in making cover purchases was, therefore, to Gunny's ultimate advantage.

10. Gunny also argues that the spot market purchases were not true substitutes for the contract purchases in that the latter were for delayed delivery during a quarter period. But Gunny's argument ignores completely the fact that American was forced to turn to the spot market because quarterly purchases were not available.