**BIGELOW–SANFORD, INC.,**
**Plaintiff-Appellee,**

v.

**The GUNNY CORPORATION,**
**Defendant-Appellant.**

**No. 80–7436.**

United States Court of Appeals,
Fifth Circuit.
Unit B

July 6, 1981.

---

Gershon, Ruden, Pindar & Olim, Jay E. Loeb, Atlanta, Ga., for defendant-appellant.

Bouhan, Williams & Levy, Edwin D. Robb, Jr., Savannah, Ga., for plaintiff-appellee.

Before MORGAN, RONEY and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

This is a companion case to and involves facts similar to those of *American Carpet Mills v. The Gunny Corporation*, 5th Cir., 649 F.2d 1056, decided today.[1] As in *American*, here Gunny admittedly breached a quarter-year contract with Bigelow-Sanford [Bigelow] for the supply of jute. The jury found in favor of Bigelow, awarding damages and attorney fees. Gunny contends on appeal, *inter alia*, that the court lacked *in personam* jurisdiction and venue, that it erroneously charged the jury regarding damages, and that there was insufficient evidence to support the award of attorney fees. We conclude that the district court did not err with respect to these is-

---

1. Although the cases were tried separately and to different juries, they were consolidated for purposes of appeal. We render two opinions because Gunny urged differing arguments in each case on appeal.

sues and that sufficient evidence supported the attorney fee award. We therefore affirm.

## I. *Facts*

As stated in *American*:

Gunny, a New York corporation with its principal place of business in New York, employs three persons, two in New York and the third, V. N. Kedia, in Georgia. Kedia, secretary of the corporation, resides in Georgia and oversees Gunny's business in that state, conducting such business out of both his home in Marietta and the offices of Blue Heaven Mills, a separate business entity, in Cartersville. According to testimony given at trial, Kedia is both president of Blue Heaven Mills and the controlling figure in Gunny. Gunny's president, Phillip Raymond, is also associated with Blue Heaven Mills.

Gunny purchases jute in India and ships it to Savannah, where stevedores unload it and place it in transit sheds maintained by the Georgia Ports Authority. Upon instructions from Gunny, the Ports Authority then delivers the jute to the buyer, in this instance American, who arranges for further transportation of the jute. In order to solicit sales of jute to carpet manufacturers in Georgia, Gunny retained as its exclusive agent in the state Crutchfield & Co. of Dalton, Georgia. Drennon Crutchfield, as Gunny's sales agent,[2] made such sales on a commission basis, obtaining Kedia's approval of all negotiations. In this manner, Crutchfield negotiated the contract with American sued upon here. (footnote in original)

Bigelow, a South Carolina corporation manufacturing carpet, maintains its principal office in Greenville, South Carolina, a sales office in Atlanta, and two mills elsewhere in Georgia. Following a similar pattern of negotiation as that described in *American*, in the fall of 1978 it contracted with Gunny for the delivery of 100,000 linear yards of jute at $.64 per yard f.o.b. Savannah during the first quarter of 1979. The jute was to be used at its Summerville, Georgia mill. Bigelow executed the contract in South Carolina, Gunny in New York. In January 1979, Gunny delivered 22,228 linear yards to Bigelow in Savannah. The February and March deliveries required under the contract were not made, and Raymond told H. A. Harris, Bigelow's Vice President for Purchasing, that they would not be. In April Gunny delivered eight more rolls to Bigelow.[3] Ultimately, 72,265 linear yards were never delivered.

Bigelow then purchased 164,503 yards of jute on the spot market, replacing jute due under the Gunny contract and those of other vendors.[4] The average price paid was $1.21 per linear yard. In making these spot market purchases, Bigelow bought a quantity of jute from Sky Line Products. This jute, some rolls marked "Gunny" and "Bigelow," had been purchased by Sky Line from Blue Heaven Mills through V. N. Kedia. There was also testimony that Gunny, despite strikes in India during late fall 1978 that delayed most jute shipments, had large stores of jute available in Savannah during the first quarter of 1979. Bigelow thus asserts that this evidence, taken cumulatively, indicates that Gunny failed to honor the Bigelow contract in order to capitalize on the delays other jute vendors were experiencing and sell its jute on the highly inflated spot market.

The jury, on special verdicts, found that Gunny had breached its contract, that appellee had purchased jute in good faith in substitution for the jute ordered from Gunny, and that it had saved no expenses as a result of Gunny's default. Using the difference between the contract price and the cost of cover purchases to measure damages, it awarded Bigelow $41,683.11. The jury also found that Gunny had been stubbornly litigious and awarded the corporation attorney fees earlier stipulated as $7,500. Gunny's motions for judgment not-

---

2. Kedia appointed Crutchfield to this position.

3. Each roll contains approximately 66.7 linear yards.

4. These other vendors eventually delivered, although after the first quarter.

withstanding the verdict or, in the alternative, for a new trial were denied.

Gunny challenges the verdict on the grounds that: 1) the court lacked jurisdiction under the Georgia Long-Arm Statute, 2) the alleged cover purchases should not have been used to measure damages for various reasons including, *inter alia*, that as they were not in substitution for the contract purchases, were not made seasonably and in good faith, and were not shown to be due to Gunny's breach, and 3) that the court erred in permitting appellee the award of attorney fees.

## II. *Jurisdiction*[5]

Gunny argues that under the Georgia Long-Arm Act [the Act] the district court lacked *in personam* jurisdiction in that the contract was neither executed nor breached in Georgia. Our recent decision in *Gold Kist, Inc. v. Baskin-Robbins Ice Cream*, 623 F.2d 375 (5th Cir. 1980) convinces us that Gunny's argument must fail. Noting that a federal court's assertion of personal jurisdiction over a nonresident defendant must comply both with the long-arm statute of the forum and the basic requirements of the due process clause of the fourteenth amendment, we held that Baskin-Robbins' Georgia contacts conferred such jurisdiction.

The Georgia Long-Arm Act, *Ga.Code Ann.* § 24–113.1, provides in pertinent part:

A court of this State may exercise personal jurisdiction over any nonresident ... as to a cause of action arising from any of the acts, omissions, ownership, use of possession enumerated in this section, ... if in person or through an agent, he:

(a) Transacts any business within this state ....

In *Baskin-Robbins*, we pointed to the fact that the Georgia Supreme Court liberally interprets the Georgia Long-Arm Act and that Georgia courts have held that the Act confers jurisdiction over "actions arising either directly or indirectly out of such transactions," *id.* at 379, and claims arising from or *"connected with "* (emphasis in *Baskin-Robbins*) such acts or transactions. From these facts, we concluded that a defendant's activity within Georgia, as long as it was purposeful, could be very slight and yet constitute "transacting business" within the state. Baskin-Robbins' agents had come to Georgia to inspect plaintiff's plant and to conduct preliminary negotiations. Furthermore, part performance had occurred within Georgia. Although we found it unnecessary to address the question of whether any of these contacts standing alone would have been sufficient to sustain jurisdiction, we noted that the Georgia courts had considered each alone to be a relevant contact. Looking to the "totality of circumstances," we held that the Georgia Long-Arm Act, as interpreted by the Georgia courts, conferred *in personam* jurisdiction over Baskin-Robbins.

Gunny's contacts with Georgia with respect to Bigelow are less than those of Baskin-Robbins in *Gold Kist* in the sense that neither Gunny agents nor executives met with Bigelow representatives in pre-contract negotiations in Georgia[6] nor did execution of the contract occur there.[7] But Gunny's contacts are also greater than those of Baskin-Robbins in that it had maintained permanent employees and agents within Georgia and shipped jute through the Savannah ports for more than a decade. Specifically with respect to the instant contract, Gunny had delivered in Savannah 22,228 of the 100,000 linear yards

---

**5.** We disagree with Gunny's contention, not discussed herein, that the district court lacked venue for reasons analogous to those stated in *American.*

**6.** Crutchfield negotiated with Bigelow representatives in its Greenville, South Carolina office, not the Summerville, Georgia mill.

**7.** In *Gold Kist*, the terms of the contract were discussed between Michigan, Indiana and California. Gold Kist then executed the contract in Georgia and forwarded it, via a broker, to Baskin-Robbins in California. We relied, however, not on the latter fact but rather on the facts that Baskin-Robbins' pre-contract negotiations occurred in Georgia, part performance was to take place within the state and a choice-of-law provision within the contract called for the application of Georgia law.

of jute promised. In *Gold Kist*, we took note of the fact that the Georgia Court of Appeals, in *Hollingsworth v. Cunard Line, Ltd.*, 152 Ga.App. 509, 263 S.E.2d 190 (1979), had recently ruled that "if a nonresident corporation purposely seeks to avail itself of business opportunities in Georgia, the resulting business transactions have the requisite connection with Georgia to sustain jurisdiction, regardless of whether the nonresident itself comes into the state or has agents or independent contractors effect this result." 623 F.2d at 380. In light of this liberal interpretation given the Act by Georgia courts, we conclude that Gunny's actions within Georgia more than met this test: it both employed agents and conducted purposeful activity within Georgia, thus conveying *in personam* jurisdiction.

■ The only remaining question in this respect is whether personal jurisdiction over Gunny may be exercised consistent with the dictates of due process. The test is two-pronged: 1) the defendant must have "minimum contacts with the forum state 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice' [and 2)] the defendant must 'purposefully [avail] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Gold Kist* at 381. In *Gold Kist*, we held that by entering into the stream of Georgia commerce, *Baskin-Robbins* satisfied the latter requirement. The same is true here. With respect to the first requirement, we discussed the general relations between the nature of the claim and the entity's contacts with the forum, recounted in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945):

> "Presence" in the state in [the due process] sense has never been doubted when the activities of the corporation there have not only been continuous and systematic, but also give rise to the liabilities sued on .... Conversely it has

been generally recognized that the casual presence of the corporate agent or even his conduct of single or isolated items of activities in a state in the corporation's behalf are not enough to subject it to suit on causes of action unconnected with the activities there....

> ... [T]here have been instances in which the continuous corporate operations within a state were thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities....

> Finally, ... the commission of some single or occasional acts of the corporate agent ..., because of their nature and quality and the circumstances of their commission, may be deemed sufficient to render the corporation liable to suit.

In the instant case, Gunny's conduct falls squarely within the first category. For more than a decade, it has maintained an employee and sales agent who have conducted business within the state, and it has imported jute from India and shipped it to Savannah for purchase by, among others, United States carpet manufacturers. This is the precise activity giving rise to Bigelow's claim. Hence, the district court's exercise of *in personam* jurisdiction was consistent with due process.[8]

### III. *Cover Damages*

■ As in *American*, Gunny contends that appellee's alleged cover purchases should not have been used to measure damages in that they were not made in substitution for the contract purchases, were not made seasonably or in good faith, and were not shown to be due to Gunny's breach. As in that case, we disagree. Again, we quote *Ga.Code Ann.* § 109A–2–711 (U.C.C. § 2–711) providing in part for cover damages where the seller fails to make delivery or repudiates the contract:

---

8. Cf. *Bankhead Enterprises, Inc. v. Norfolk & W. Ry. Co.*, 642 F.2d 802 (5th Cir. 1981) (due process requirement of jurisdiction satisfied where Norfolk and Western had maintained office in Georgia for 17 years, officer of the corporation was located there, and company had purposefully conducted business activities in Georgia (more than having solicited sales)).

(1) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (109A–2–612), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid

(a) "cover" and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or

(b) recover damages for nondelivery as provided in this Article (109A–2–713).

Title 109A–2–712 (U.C.C. § 2–712) defines cover:

(1) After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (109A–2–715), but less expenses saved in consequence of the seller's breach.

(3) Failure of the buyer to effect cover within this section does not bar him from any other remedy.

In addition, the purchaser may recover under Title 109A–2–713:

(1) Subject to the provisions of this Article with respect to proof of market price (109A–2–723), the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this Article (109A–2–715), but less expenses saved in consequence of the seller's breach.

(2) Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival.

Most importantly, "whether a plaintiff has made his cover purchases in a reasonable manner poses a classic jury issue." *Transammonia Export Corp. v. Conserv, Inc.,* 554 F.2d 719, 724 (5th Cir. 1977). The district court thus acted properly in submitting the question of cover damages to the jury, which found that Gunny had breached, appellee had covered, and had done so in good faith without unreasonable delay by making reasonable purchases, and was therefore entitled to damages under § 2–712. Gunny argues Bigelow is not entitled to such damages on the ground that it failed to make cover purchases without undue delay and that the jury should not have been permitted to average the cost of Bigelow's spot market purchases totalling 164,-503 linear yards in order to arrive at the cost of cover for the 72,265 linear yards Gunny failed to deliver.[9] Both arguments fail. Gunny notified Bigelow in February that no more jute would be forthcoming. Bigelow made its first spot market purchases in mid-March. Given that it is within the jury's province to decide the reasonableness of the manner in which cover purchases were made, we believe the jury could reasonably decide such purchases, made one month after the date the jury assigned to Gunny's breach, were made without undue delay. The same is true with respect to Gunny's second argument: Bigelow's spot market purchases were made to replace several vendors' shipments. Bigelow did not specifically allocate the spot market replacements to individual vendors' accounts, however, nor was there a requirement that they do so. The jury's method of averaging such costs and assigning them to Gunny in proportion to the amount of jute it failed to deliver would, therefore, seem not only fair but well within the jury's permissible bounds.

**9.** Bigelow acquired the 164,503 linear yards of jute in four separate spot market purchases. Gunny argues that only the first two purchases (totalling more than 73,000 yards) should have been used to calculate Bigelow's cover damages with respect to Gunny because the price per yard for these purchases was slightly less than that of the latter two.

■ Gunny also argues that the court erroneously charged the jury regarding damages under both §§ 2–712 and 2–713. We disagree. Whether Bigelow covered was a question of fact submitted to the jury. In the event that it had not, alternative damages were available to Bigelow under § 2–713. *Neal-Cooper Grain Co. v. Texas Gulf Sulfur Co.*, 508 F.2d 283 (7th Cir. 1974). The jury found that Bigelow had covered and awarded damages under § 2–712; § 2–713 then became irrelevant. Since either was applicable until that time, the court's charge as to both sections was not error.

### IV. *Attorney Fees*

■ The jury also awarded Bigelow attorney fees under *Ga.Code Ann.* § 20–1404, which provides:

> The expenses of litigation are not generally allowed as a part of the damages; but if the defendant has acted in bad faith, or has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

The jury found that Gunny had been stubbornly litigious; Gunny argues that there was insufficient evidence in the record to support that finding.

In *Georgia-Carolina Brick & Tile Co. v. Brown*, 153 Ga.App. 747, 753, 266 S.E.2d 531 (1980), the court addressed this provision of § 20–1404: "[T]he question of whether attorney fees are authorized for stubborn litigiousness should focus on whether defendant's resistance of the claim was bottomed on a bona fide controversy or dispute, since the absence of such is the essence of the attorney fee award for stubborn litigiousness." (emphasis omitted) From our review of the record, we believe the jury could reasonably conclude that Gunny presented little or no evidence showing that its breach did not occur, explaining the breach, or reasonably contesting Bigelow's claimed damages. On this basis, there was sufficient evidence for the jury to find Gunny stubbornly litigious within the meaning of the statute.

Accordingly, the judgment is AFFIRMED.