**DELONG EQUIPMENT COMPANY, Plaintiff-Appellant,**

v.

**WASHINGTON MILLS ABRASIVE CO., et al., Defendants-Appellees.**

No. 86–8872.

United States Court of Appeals, Eleventh Circuit.

March 23, 1988.

William E. Sumner, Sumner & Hewes, Stephen J. Anderson, Atlanta, Ga., for plaintiff-appellant.

Emmet J. Bondurant, Bondurant, Mixson & Elmore, Carolyn Rachel Gorwitz, Atlanta, Ga., for defendants-appellees.

Before TJOFLAT and ANDERSON, Circuit Judges, and ROETTGER[*], District Judge.

ANDERSON, Circuit Judge:

In this appeal, Delong Equipment Company ("Delong"), plaintiff below, challenges the dismissal of defendants Robert Biebel ("Robert"), BCS Company, Inc. ("BCS"), and William Biebel ("William") from an antitrust action it brought in the Northern District of Georgia. For the reasons stated below, we reverse the dismissal of Robert and BCS and affirm the dismissal of William.

## I. BACKGROUND

### A. *Standard of Review*

In this case, the factual predicate for the district court's ruling was the complaint and the numerous affidavits filed by both sides. No evidentiary hearing was held. This procedure is within the court's discretion. *Edwards v. Associated Press*, 512 F.2d 258, 262 n. 8 (5th Cir.1975);[1] *Spelsberg v. Sweeney*, 514 F.Supp. 622, 623 (S.D. Ga.1981).

This appeal involves motions to dismiss for ineffective service of process, lack of personal jurisdiction, and improper venue. *See* Fed.R.Civ.P. 12(b). In the context of such motions in which no evidentiary hearing is held, the plaintiff must present only a prima facie showing of venue and personal jurisdiction. *Bracewell v. Nicholson Air Service, Inc.*, 748 F.2d 1499, 1504 (11th Cir.1984); *Jetco Electronic Industries, Inc. v. Gardiner*, 473 F.2d 1228, 1232 (5th Cir.1973); *Psychological Resources Support Systems v. Gerleman*, 624 F.Supp. 483, 484 (N.D.Ga.1985). The facts as alleged in the complaint are taken as true, to the extent they are uncontroverted by defendants' affidavits. *Black v. Acme Markets, Inc.*, 564 F.2d 681, 683 n. 3 (5th Cir. 1977); *National Egg Co. v. Leumi le-Israel B.M.*, 504 F.Supp. 305, 309 (N.D.Ga. 1980). In addition, "[w]hen there is a battle of affidavits placing different constructions on the facts, the court is inclined to give greater weight, in the context of a motion to dismiss, to the plaintiff's version ...," particularly when "the jurisdictional questions are apparently intertwined with the merits of the case," as is true in this appeal. *Psychological Resources Support Systems*, 624 F.Supp. at 486–87. *See also Vest v. Waring*, 565 F.Supp. 674, 693 (N.D. Ga.1983) ("All pleadings and affidavits introducing evidence relating to jurisdictional facts are to be construed in the light most favorable to the plaintiff"). Consequently, the facts detailed below, distilled from the complaint and the affidavits of the parties, construe all reasonable inferences in favor of Delong.

### B. *Facts*

Delong Equipment Company, a Georgia corporation, brought this antitrust action in the District Court for the Northern District of Georgia against three corporate and six individual defendants,[2] alleging various violations of the Sherman, Clayton, and Robinson-Patman Antidiscrimination Acts, 15 U.S.C. §§ 1–7, 12–15 and 26, and assorted other state law claims. The substantive claims in this case stem from the marketing, pricing, and supply of a product called "media" to certain companies in Georgia, South Carolina and Alabama.[3] Delong asserts that the defendants—a media manufacturer, a media distributor, and certain officers and directors of these companies—

---

[*] Honorable Norman C. Roettger, Jr., U.S. District Judge for the Southern District of Florida, sitting by designation.

[1.] This case was decided prior to the close of business on September 30, 1981, and is binding precedent under *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981).

[2.] Not all the defendants in this action were dismissed. We have jurisdiction over this appeal because the district court's order dismissing Robert, William, and BCS was entered as a final judgment in accordance with Fed.R.Civ.P. 54(b).

[3.] Media is a hard, abrasive substance which is cut into various sizes and shapes and used to clean and polish the unassembled metal parts of airplanes and industrial machinery. Some cuts of media are standard, generic sizes and shapes ("stock" media) while others are cut to a manufacturer's particular specifications.

conspired to restrain trade and monopolize the media market in the Georgia-Alabama-South Carolina tri-state area by segmenting the market, inflating the prices of "stock" media, excluding Delong from the market, and diverting Delong's customers to other media distributors in the area.

Delong is a nationwide distributor of equipment and supplies, such as media, for industrial processes. Much of Delong's business is focused in the Georgia-Alabama-South Carolina tri-state area. Defendant Washington Mills Ceramic Corporation, a subsidiary of defendant Washington Mills Abrasive Company, Inc. (collectively "Washington Mills"), manufactures media and sells this product nationwide through distributors. Washington Mills Ceramic Corporation is a Florida corporation whose registered principal place of business is Florida. Washington Mills Abrasive Company, Inc. is a Massachusetts corporation whose registered principal place of business is Massachusetts. Defendant BCS, a Connecticut corporation whose registered principal place of business is the United States Virgin Islands, is the sole New England distributor of Washington Mills media. BCS also distributes Washington Mills media in North Carolina, South Carolina and Florida. Among BCS' longstanding media customers is the Pratt & Whitney Aircraft Company plant in East Hartford, Connecticut. BCS also has serviced the Pratt & Whitney Aircraft plant in West Palm Beach, Florida. Defendant Robert Biebel is a vice-president and director of BCS and a Connecticut resident. Defendant William Biebel is a director and retired officer of BCS and a Connecticut resident.

Pratt & Whitney Aircraft Company ("Pratt & Whitney"), a manufacturer of aircraft engines, opened a plant in Columbus, Georgia in 1983. In anticipation of competing for the Pratt & Whitney (Columbus) media account, Delong became a Washington Mills distributor in 1982. In late 1982, Pratt & Whitney released certain specifications for the Columbus plant which required, among other things, that a large supply of media be available on 24-hour notice. Delong alleges that these specifica-

tions called for the use of a standard type of media carried in open stock by Washington Mills and other media manufacturers.

Shortly after Pratt & Whitney released the specifications, Delong alleges that Washington Mills informed it that the Pratt & Whitney plant required the use of a higher-priced "BCS" designated media, that the Pratt & Whitney account "belonged" to BCS, and that other media accounts in the area "belonged" to other Washington Mills distributors.

In its efforts to obtain the Pratt & Whitney account, Delong informed Pratt & Whitney that the "BCS" media was not a special type of media manufactured by Washington Mills but rather was a type of stock media with a proprietary label indicating the distributor. Pratt & Whitney then asked Washington Mills to provide Delong with the generic specifications of the "BCS" media it used. Washington Mills informed Delong that a new type of media, "5,000 P & W special," was required by the Pratt & Whitney specifications. Shortly thereafter, the 1982 Pratt & Whitney media specifications for the Columbus plant were revised to state that "5,000 P & W Special" media and two other specially designated Washington Mills media products were required. Delong contends that these specially designated "P & W" media, like the "BCS" media, are standard generic stock media sold at highly-inflated prices because of the proprietary labels.

In a meeting in Atlanta in early 1983, Robert Biebel, on behalf of BCS, met with Harold Delong, the president of Delong, to discuss the Pratt & Whitney (Columbus) account. Robert allegedly told Delong that the account "belonged" to BCS but that there was "plenty of money in it for both of us" if Delong would agree to sell Pratt & Whitney the higher-priced "BCS" media and to share the resulting profits with BCS. In consideration, BCS would provide Delong with technical assistance and expertise. Apparently, the 24-hour notice limitation prevented BCS from servicing the Columbus account itself and therefore it wanted to affiliate itself with a Georgia company that could meet the notice re-

quirement. Delong declined to cooperate with BCS and thereafter secured the Pratt & Whitney (Columbus) account on its own.

As a Washington Mills distributor, Delong attempted to purchase the lower-priced stock media from Washington Mills to supply to the Pratt & Whitney Columbus plant. On occasion, Washington Mills complied with the order; at other times, Washington Mills shipped media with a proprietary designation to Pratt & Whitney and charged Delong the premium rate. Delong maintained the account until August of 1985, when it was terminated as a Washington Mills distributor.

Before the Pratt & Whitney (Columbus) media account was awarded to Delong, BCS supplied the Columbus plant with $57,-000 worth of media, through Pratt & Whitney's East Hartford plant, which was used for "start-up" purposes. During the period in which Delong serviced the Columbus account, BCS shipped three small unsolicited orders of media to the Columbus plant. The total value of these shipments was less than $5,000. After Delong's termination as a Washington Mills distributor, BCS filled several additional media orders for the Columbus plant, the total value of which also was less than $5,000. BCS had little other contact with the Columbus facility. Robert, however, did visit the Columbus facility in 1984 during a flight layover at the Atlanta airport.

Delong also contends that BCS has transacted other business in the Northern District of Georgia, some of which directly pertains to antitrust violations alleged in the litigation. For example, Delong supplied media to Republic Airlines in Atlanta, which used the media to service its Pratt & Whitney engines. After receiving an initial shipment of stock media from Delong, Republic informed Delong that the Pratt & Whitney engine specifications required the use of "BCS" media. Delong examined the "BCS" media Republic had been using and determined that it was a mixture of three types of stock media packaged and sold together at a much higher price than those charged for the individual types of stock media. Delong contends that this strongly suggests an additional BCS contact with the Northern District of Georgia. In addition, Delong asserts that BCS purchased $30,000 worth of "hardened steel shot" from Hoover Universal Ball & Roller Division, whose principal place of business is in the Northern District of Georgia.

## II. PERSONAL JURISDICTION: SERVICE OF PROCESS AND MINIMUM CONTACTS

Before a federal court may exercise personal jurisdiction over a defendant, there must exist both a constitutionally sufficient relationship between the defendant and the forum, i.e. minimum contacts, and a basis for the defendant's amenability to service of summons. *Omni Capital International Ltd. v. Rudolf Wolff & Co., Ltd.,* — U.S. —, —, 108 S.Ct. 404, 409, 98 L.Ed. 2d 415 (1987). We first address the service of process issue, then the minimum contacts issue.

### A. *Service of Process: William, Robert & BCS*

Federal Rule of Civil Procedure 4(e) prescribes how process can be served on an out-of-state defendant in a federal civil case.[4] Under this rule, if a federal statute containing a service of process provision is applicable to the case, service on an out-of-state defendant is made according to its terms. In the absence of such a statute, service of process is made "under the circumstances and in the manner prescribed ..." by the law of the state in which the district court sits. *See Omni Capital In-*

---

4. Fed.R.Civ.P. 4(e) provides, in pertinent part: "Whenever a statute of the United States or an order of court thereunder provides for service of a summons ... upon a party not an inhabitant of or found within the state in which the district court is held, service may be made under the circumstances and in the manner prescribed by the statute or order, or, if there is no provision therein prescribing the manner of service, in a manner stated in this rule. Whenever a statute or rule of court of the state in which the district court is held provides (1) for service of a summons ... upon a party not an inhabitant of or found within the state, ... service may ... be made under the circumstances and in the manner prescribed in the statute or rule."

*ternational,* —— U.S. at ——, 108 S.Ct. at 410; *DeMelo v. Toche Marine, Inc.,* 711 F.2d 1260, 1266 (5th Cir.1983).

■ The district court applied the correct service of process statute to each defendant. It held that BCS was subject to the nationwide service of process provision of the Clayton Act, 15 U.S.C. § 22, which provides that process may be served upon a corporate defendant in an antitrust action "in the district of which it is an inhabitant, or wherever it may be found." We affirm the district court's holding that service of process on BCS was authorized.

The Clayton Act provision applies only to corporations, however, and there is no other appropriate federal service statute or order applicable to individual non-corporate defendants in antitrust litigation. Service of process on Robert and William therefore must be made in accordance with the applicable Georgia statute, O.C.G.A. § 9–10–94.[5] *Vest v. Waring,* 565 F.Supp. at 693 n. 24. Section 9–10–94 provides that a non-resident may be served in the same manner as a resident if the non-resident is subject to Georgia's long-arm statute, O.C.G.A. § 9–10–91. Consequently, we must determine whether the Georgia long-arm statute applies to the individual defendants, William and Robert Biebel.

The Georgia long-arm statute, O.C.G.A. § 9–10–91, provides in part:

A court of this state may exercise personal jurisdiction over any nonresident ... as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he

were a resident of the state, if in person or through an agent, he:

(1) transacts any business within this state;

(2) commits a tortious act or omission within this state, except as to a cause of action for defamation of character arising from the act;

(3) commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state; ...

Delong contends that personal jurisdiction is supported under each of the three prongs of the long-arm statute. It is clear, however, that the "transacts any business" test of O.C.G.A. § 9–10–91(1) applies only to contract claims. *Lutz v. Chrysler Corp.,* 691 F.2d 996, 997 (11th Cir.1982) (adopting holding of *Whitaker v. Krestmark of Alabama, Inc.,* 157 Ga.App. 536, 537–38, 278 S.E.2d 116, 118 (1981)); *Psychological Resources Support Systems,* 624 F.Supp. at 485. The claims presented in this case, alleging conspiracy and other antitrust violations, sound in tort rather than contract and must be analyzed under subsections 2 and 3 of the Georgia long-arm statute. *See Myers v. American Dental Association,* 695 F.2d 716, 723 (3d Cir. 1982), *cert. denied* 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983) (antitrust claims are, in essence, "forms of torts alleging business injury").[6]

To comply with §§ 2 and 3 of the Georgia long-arm statute, as interpreted to the

5. Section 9–10–94 provides: "A person subject to the jurisdiction of the courts of the state under Code Section 9–10–91, or his executor or administrator, may be served with a summons outside the state in the same manner as service is made within the state by any person authorized to make service by the laws of the state, territory, possession, or country in which service is made or by any duly qualified attorney, solicitor, barrister, or the equivalent in such jurisdiction."

6. We note that Delong is not disadvantaged by our decision not to apply the "transacts any business" prong of the long-arm statute. The

Georgia Court of Appeals explained that "there is no engrafting on this 'tort' section [9 O.C.G.A. § 9–10–91(2) ] the requirement that this activity amounts to a 'transaction of business' within this state. Activity which will support a finding of a 'contact' with Georgia for purposes of exercising jurisdiction under subsection [2] need not be so extensive as to meet the definitional requirements of subsection [1]." *Shellenberger v. Tanner,* 227 S.E.2d at 275–76. *Swafford v. Avakian,* 581 F.2d 1224, 1226 (5th Cir.1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979).

maximum limits of due process,[7] the following three-part test must be satisfied:

(1) the nonresident has purposefully done some act or consummated some transaction with or in the forum (but the actual act or omission resulting in the injury here need not have occurred in this state). The defendant need not be physically within the forum when this act or transaction occurs and a single such instance may suffice;

(2) the Georgia plaintiff must have a legal cause of action in tort against the nonresident, which arises out of, or results from, the purposeful activity of the defendant involving this state; a resident is the victim of a 'tortious act' when he suffers an injury here due to an act or omission of negligence occurring outside this state; and

(3) if the requirements of (1) and (2) are satisfied, the exercise of jurisdiction over the nonresident must be 'reasonable.'

*Shellenberger v. Tanner*, 138 Ga.App. 399, 404–05, 227 S.E.2d 266, 273 (1976), cited with approval in *Swafford v. Avakian*, 581 F.2d 1224, 1226 (5th Cir.1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979); *Attwell v. LaSalle National Bank*, 607 F.2d 1157, 1160–61 (5th Cir.1979); *Gold-Kist Inc. v. Baskin-Robbins Ice Cream Co.*, 623 F.2d 375, 378–80 (5th Cir. 1980); *Bankhead Enterprises, Inc. v. Norfolk & W. Ry. Co.*, 642 F.2d 802, 805 n. 3 (5th Cir. Unit B, 1981);[8] and *Smith v. Smith*, 254 Ga. 450, 330 S.E.2d 706, 706 (1985).

■ We conclude that William's minimal contact with Georgia—the single phone call to Harold Delong regarding Robert's arrival there for the Atlanta meeting—was so insignificant that it does not satisfy the terms of the long-arm statute itself, even without regard for the additional *Shellenberger* due process requirements. Therefore, service of process could not be had on William, and he must be dismissed from this litigation.

■ With respect to Robert and BCS, however, we conclude that the contacts with Georgia were sufficient to satisfy the three prongs of the *Shellenberger* test, and therefore service of process can be had over both of these defendants. The District Court failed to appreciate the significance of these contacts.

The single most important Georgia contact was Robert's 1983 meeting with Harold Delong in Atlanta. In his affidavits, Harold Delong asserts that Robert, acting on behalf of BCS, told Delong that although the Pratt & Whitney account "belonged" to BCS, Delong could serve as Pratt & Whitney's local media supplier so that the 24–hour notice requirement for the Columbus facility could be met. In addition, Robert told Delong that there was "plenty of money in it for both of us" if Delong would agree to distribute media with a proprietary "BCS" label to the Columbus plant at a substantially higher price than that charged for stock media. This is the heart of the alleged tort: conspiracy to restrain the trade and monopolize the sale of "media" in the tri-state area.

There also are several less significant contacts with Georgia.[9] First, before the Pratt & Whitney (Columbus) plant media contract was awarded to Delong, BCS filled a $57,000 start-up order for the Columbus facility through the East Hartford Pratt & Whitney headquarters. Second, after De-

---

**7.** It is well established in the Eleventh Circuit and among the Georgia state courts that the Georgia long-arm statute is to be interpreted to the maximum limits of due process. *Gold-Kist, Inc. v. Baskin-Robbins Ice Cream*, 623 F.2d 375, 378 (5th Cir.1980) ("Courts have been most emphatic in their expansive reading of the long-arm act in the tort cases under subsections [2] and [3] ..."); *Coe & Payne Co. v. Wood-Mosiac Corp.*, 230 Ga. 58, 60, 195 S.E.2d 399 (1973); *Bradlee Management Services v. Cassells*, 249 Ga. 614, 292 S.E.2d 717 (1982).

**8.** This former Fifth Circuit case was decided after the close of business on September 30, 1981, and is binding precedent under *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982).

**9.** In the posture of this case, we believe that it is reasonable to impute knowledge of and at least partial responsibility for these other contacts to Robert. Robert was a vice-president of BCS and appears to have been the principal corporate officer active in the activities of BCS which are the focus of this litigation.

long was awarded the contract, BCS shipped several small, unsolicited orders of media to the Columbus plant, the total value of which was less than $5,000. Third, after Delong's distributorship with Washington Mills was terminated, BCS sold an additional small amount of media to the Columbus facility. Fourth, in 1984, Robert made a spur-of-the-moment visit to the Columbus plant during a layover at the Atlanta airport. Finally, there is evidence that Republic Airlines, based in Atlanta, required the special "BCS" media for use on its Pratt & Whitney engines. Although Delong presented no evidence that BCS sold or otherwise distributed the media to Republic Airlines, BCS' appellate counsel conceded at oral argument that Republic's insistence on using "BCS" media created at least a plausible inference that BCS had sold the special media to the airline, thus creating another Georgia contact related to the substantive issues in the suit.

The first prong of the *Shellenberger* test requires that the defendant must purposefully have performed some act with or in the forum state. This requirement is meant to prevent a resident plaintiff's unilateral actions from connecting a nonresident to the forum state. *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Shellenberger,* 227 S.E.2d at 274. The Atlanta meeting between Robert and Harold Delong certainly was not a unilateral action on the part of Delong. According to Delong's affidavit, an employee of defendant Washington Mills arranged the meeting and it is undisputed that Robert traveled to Atlanta from Connecticut for the sole purpose of attending the meeting. Moreover, the other Georgia contacts, listed above, were unilateral actions taken by the *defendants themselves* which brought them into contact with Georgia on their own initiative. We conclude that the Georgia contacts, particularly the 1983 Atlanta meeting between Robert Biebel and Harold Delong, clearly constitute "purposefully done ... act[s]" in Georgia within the meaning of the first prong of the *Shellenberger* personal jurisdiction test.

The second prong of the *Shellenberger* test requires that a plaintiff's cause of action must result from the defendants' purposeful activities with or in the forum. The focus of the Atlanta meeting directly concerns many of the claims raised in Delong's complaint: division of markets, price discrimination, and illegal conduct restricting competition. Many of the other contacts stated above also are related to the gist of the antitrust action, namely the allegations concerning BCS' continued efforts to enter and control the media distribution market in Georgia through illegal methods. We conclude, therefore, that the antitrust claims against BCS and Robert arise out of and result from their contacts with Georgia, thereby satisfying the second prong of the *Shellenberger* criteria.

The third *Shellenberger* prong requires that the exercise of personal jurisdiction over—and consequently service of process on—the nonresident defendant must be "reasonable." The *Shellenberger* court cited several factors by which it judged the reasonableness of establishing jurisdiction over the nonresident defendant in that case. 227 S.E.2d at 277. Application of these factors to the facts of this appeal lead us to conclude that extending personal jurisdiction over Robert and BCS is entirely reasonable.

First, Georgia has a legitimate interest in protecting its resident businesses and consumers from the detriments and injuries inflicted by nonresident companies operating (or attempting to operate) within Georgia in violation of the antitrust laws. Second, the District Court for the Northern District of Georgia would be available to Robert and BCS to enforce the antitrust laws against Delong, if such action was necessary. Third, any inconvenience caused to Robert and BCS by subjecting them to the jurisdiction of the Northern District of Georgia is overridden by the greater inconvenience of requiring a Georgia plaintiff, injured in Georgia by the defendants' purposeful activity in and directed at Georgia, to pursue its cause of action in a foreign forum. In complex antitrust litigation involving numerous defendants from diverse geographic locations, it would

be onerous and cumbersome to require the plaintiff to proceed separately against each defendant in the defendant's home forum, particularly given the strong federal interest in allowing for efficient conduct of a complex lawsuit. Fourth, it is clear that the Georgia legislature "has given the courts of this state [and federal courts applying state law, under Fed.R.Civ.P. 4(e)] the authority to entertain litigation against nonresidents who commit a tortious injury in this state." *Id.*

Robert's and BCS' activities noted above were deliberately conducted and, more importantly, were significant to Delong's cause of action. In fact, Delong's claims against the BCS defendants derive primarily from these contacts with Georgia. Recognizing that "the question of 'reasonableness' in the exercise of jurisdiction takes on a true independent significance ..." in situations where the only contacts between the forum and the defendant are those on which the plaintiff's claims are based, *Shellenberger,* 227 S.E.2d at 273, we hold that it is entirely reasonable to subject Robert and BCS to the long-arm jurisdiction of Georgia.[10]

Robert contends that even if he fulfills the requirements of the *Shellenberger* test, the Georgia long-arm statute does not extend to him in his individual capacity because his contacts with Georgia all occurred while he was acting as an officer and director on behalf of BCS. Even if all of Robert's contacts with Georgia were on behalf of BCS, however, we hold that he is amenable to service of process because of his participation in the Atlanta meeting which directly involved him in the alleged wrongful conduct of BCS.

■ Robert's argument rests on the general proposition that an individual is not personally liable for a corporation's torts solely because of his position as an officer or director of a corporation. *Agra Chemical Distributing Co. v. Marion Laboratories, Inc.,* 523 F.Supp. 699, 702–03 (W.D.N. Y.1981) ("An individual's presence [in the forum] in his or her capacity as a corporate officer is not a proper basis of jurisdiction or venue against the individual personally."); *Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d 902, 906 (1st Cir.1980). While we agree with this general rule, we recognize that it is equally well settled that personal participation by a corporate employee, officer, or director in the wrongful activities of a corporation is sufficient to make the individual, as well as the corporation, substantively liable for a tort. *Union Carbide Corp. v. UGI Corp.,* 731 F.2d 1186, 1189 (5th Cir.1984); *Columbia Briargate Co. v. First National Bank,* 713 F.2d 1052, 1064–65 (4th Cir.1983), *cert. denied sub. nom Pearson v. Columbia Briargate Co.,* 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed. 2d 233 (1984); *Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d at 907; *Donsco, Inc. v. Casper Corp.,* 587 F.2d 602, 606 (3d Cir.1978); *Lobato v. Pay Less Drug Stores,* 261 F.2d 406, 408–09 (10th Cir. 1958).

■ We conclude that it is reasonable and comports with notions of "fair play"

---

**10.** We note that while several contacts are present in this case, a single act can be sufficient to satisfy the minimum contacts test, even an act that occurs outside the forum. Such an act must bear a significant relationship to the cause of action. *Bigelow-Sanford, Inc. v. Gunny Corp.,* 649 F.2d 1060, 1064 (5th Cir. Unit B 1981) (citing *International Shoe* language that "'the commission of some single or occasional acts of the corporate agent, ... because of their nature and quality and the circumstances of their commission, may be deemed sufficient to render the corporation liable to suit.'"); *National Egg Co. v. Leumi le-Israel B.M.,* 504 F.Supp. 305, 309–10 (N.D.Ga.1980) (single telephone conversation sufficient contact where it was crucial to allegations of fraud and misrepresentation). *See, e.g., Shellenberger v. Tanner,* 227 S.E.2d at 271

("[T]he clear and discernible trend of recent authority is to the effect that a single act by the nonresident in the forum, ... having its impact within the territory of the forum may satisfy the 'minimum contacts' test."). Here, where several Georgia contacts exist, most of which are related to the cause of action and one of which, the Atlanta meeting, is a crucial part of the plaintiff's case against defendants, the first two prongs of the *Shellenberger* test clearly are satisfied with respect to Robert and BCS. It is probable that if the Atlanta meeting was the only link with Georgia, service of process still would be permissible, given the strong nexus between the activities that occurred during the meeting and the cause of action; however, we need not decide that question in this case.

and "substantial justice" [11] to extend a forum's long-arm statute to a non-resident individual who commits an act in the forum for which he can be held substantively liable, even if his actions in and contacts with the forum were entirely in his capacity as a corporate officer or director. The crucial matter is whether the individual defendant can be held personally liable for acts committed in the forum, not whether his contacts with the forum arose in his personal capacity. If substantive liability can extend to an individual for acts performed on behalf of a corporation, then the individual is amenable to the forum's long-arm statute, at least in situations where the nonresident individual physically was present in the forum when he participated in the tort. As the Fourth Circuit concluded in a thorough and well-reasoned opinion addressing this issue:

> [W]hen a nonresident corporate agent is sued for a tort committed by him in his corporate capacity in the forum state in which service is made upon him without the forum under the applicable state long-arm statute as authorized by Rule 4(e), he is properly subject to the jurisdiction of the forum court, *provided the long-arm statute of the forum state is coextensive with the full reach of due process.* On the other hand, if the claim against the corporate agent rests on nothing more than that he is an officer or employee of the nonresident corporation and if any connection he had with the commission of the tort occurred without the forum state, we agree that, under sound due process principles, the

nexus between the corporate agent and the forum state is too tenuous to support jurisdiction over the agent personally by reason of service under the long-arm statute of the forum state. In reaching this conclusion, we are influenced strongly by the consideration that this application of the rule of amenability to jurisdiction as adopted removes that contradiction or 'dichotomy' perceived by *Marine Midland* 'between the principles governing the personal liability of corporate agents for torts committed in their corporate roles and the principles governing the amenability of such agents to personal jurisdiction solely on the basis of those acts.' 664 F.2d [899] at 902.

*Columbia Briargate Co. v. First National Bank,* 713 F.2d at 1064–65.

Under § 14 of the Clayton Act, 15 U.S.C. § 24, it is clear that if BCS is guilty of antitrust violations, liability can extend to Robert for any illegal actions he authorized, ordered, or in which he participated.[12] Because in ruling on a defendant's motion to dismiss we must look to the facts as alleged in the light most favorable to the plaintiff, we conclude that if, on the merits, Delong establishes illegal conduct by BCS, Robert's meeting in Atlanta with Harold Delong in which Robert made overtures about price discrimination and market segmentation likely would constitute an action for which Robert could be held personally liable under § 14 of the Clayton Act. Consequently, we hold that personal jurisdiction can extend to him in his individual capacity.[13]

---

**11.** *See International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), and this opinion's discussion of minimum contacts, *infra.*

**12.** 15 U.S.C. § 24 provides that:
Whenever a corporation shall violate any of the penal provisions of the antitrust laws, such violation shall be deemed to be that also of the individual directors, officers, or agents of such corporation who shall have authorized, ordered or done any of the acts constituting in whole or in part such violation, and such violation shall be deemed a misdemeanor, and upon conviction therefor of any such director, officer, or agent he shall be punished by a fine of not exceeding $5,000 or by impris-

onment for not exceeding one year, or by both, in the discretion of the court.

**13.** Defendants cite *Agra Chemical Distributing Co. v. Marion Laboratories,* 523 F.Supp. 699 (W.D.N.Y.1981), and *Lehigh Valley Industries, Inc. v. Birenbaum,* 527 F.2d 87 (2d Cir.1975), in support of their argument against jurisdiction over Robert in his individual capacity. These cases are distinguishable because they do not involve situations in which an individual defendant, acting on behalf of a corporation, performed acts *in the forum state* for which he could be *substantively liable. See Columbia Briargate Co. v. First National Bank,* 713 F.2d 1052 (4th Cir.1983), for a thorough discussion of the relationship of these and other cases to the jurisdictional rule applied in this appeal.

For the foregoing reasons, both BCS and Robert are amenable to service of process.

### B. Minimum Contacts: Robert & BCS

Having determined that Robert and BCS were served properly pursuant to the Georgia long-arm statute, we turn to the other prong of *Omni Capital International*, i.e. whether there is a "constitutionally sufficient relationship between the defendant and the forum." —— U.S. at ——, 108 S.Ct. at 409.

In *Helicopteros Nacionales de Columbia F.A. v. Hall*, 466 U.S. 408, 414–17 and n. 8, 9, 104 S.Ct. 1868, 1872–74 n. 8, 9, 80 L.Ed.2d 404 (1984), the Supreme Court noted that there are two types of personal jurisdiction: general and specific. General personal jurisdiction arises from a party's contacts to the forum state that are unrelated to the litigation; the test for general jurisdiction is whether the party had "continuous and systematic" general business contacts with the forum state. *Perkins v. Benquet Consolidated Mining Co.*, 342 U.S. 437, 438, 72 S.Ct. 413, 414, 96 L.Ed. 485 (1952). Specific personal jurisdiction is founded on a party's contacts to the forum state that are related to the cause of action. The two-part *International Shoe* "minimum contacts" due process analysis is used to evaluate specific personal jurisdiction issues. *See Burger King v. Rudzewicz*, 471 U.S. at 473 n. 15, 105 S.Ct. at 2182 n. 15; *Borg-Warner Acceptance Corp. v. Lovett & Tharp, Inc.*, 786 F.2d at 1057. We are concerned only with specific personal jurisdiction in this appeal. Delong does not argue that Robert and BCS had the systematic and continuous general business contacts with Georgia to create general personal jurisdiction.

A "constitutionally sufficient relationship" exists if the non-resident defendant has adequate "minimum contacts" with the forum state and if the assertion of a forum's jurisdiction comports with the "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). As the Supreme Court stated in *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977), "the central concern of the inquiry into personal jurisdiction ... is the relationship among the defendant, the forum, and the litigation...." *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055, 1057 (11th Cir.1986).

The crucial issue is whether BCS' and Robert's contacts with the forum state are substantial enough that they reasonably "could expect to be haled before a [Georgia] court," *Shaffer v. Heitner*, 433 U.S. at 204, 97 S.Ct. at 2586. *See World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980) ("The Due Process Clause ... gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit."); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775–76, 104 S.Ct. 1473, 1479, 79 L.Ed.2d 790 (1984) ("the 'fairness' of haling respondent into [a Georgia] court depends to some extent on whether respondent's activities relating to [Georgia] are such as to give that State a legitimate interest in holding respondent answerable on a claim related to those activities.") A defendant has fair warning that it might be subject to a forum's jurisdiction if the defendant purposefully directs its activities at forum residents and "the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985), quoting *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 415, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). As Justice Brennan explained in *Burger King v. Rudzewicz*:

> [W]here the defendant 'deliberately' has engaged in significant activities within a State ... he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by 'the benefits and protections' of the forum's laws, it is presumptively not unreasonable to require him to sub-

mit to the burdens of litigation in the forum as well.

105 S.Ct. at 2184. Furthermore, although the minimum due process requirements do not necessitate that a defendant must have physical contact with the forum, such a "territorial presence frequently will enhance a potential defendant's affiliation with a state and reinforce the reasonable foreseeability of suit there." *Id.*

■ We conclude that both Robert and BCS had sufficient "minimum contacts" with Georgia to fulfill the first prong of the *International Shoe* due process analysis. We need not reiterate the details of these contacts; they are amply described in our discussion of service of process under the Georgia long-arm statute. Briefly, it is clear that Robert and BCS exercised the "privilege of conducting business" within Georgia by attempting to garner the Pratt Whitney (Columbus) media account and by servicing Republic Airlines' media requirements. The primary focus of BCS' and Robert's alleged illegal conduct was the Georgia market: the defendants attempted to control the supply of media to Georgia consumers (Pratt Whitney; Republic Airlines), initially through unsuccessful conspiratorial negotiations with Delong at a meeting in Atlanta, and subsequently through efforts to exclude Delong from the Georgia market. The alleged injury occurred in Georgia because of defendants' purported activity in and directed at Georgia. As Justice White explained in *World-Wide Volkswagen,* where the tort which is the basis of the litigation "arises from the efforts of the manufacturer ... to serve directly or indirectly the market for its product in other States, it is not unreasonable to subject it to suit in one of those States." 444 U.S. at 297, 100 S.Ct. at 567.

The second prong of the *International Shoe* due process analysis requires us to determine whether Georgia's exercise of jurisdiction over BCS and Robert violates the traditional notions of "fair play and substantial justice." 326 U.S. at 316, 66 S.Ct. at 158. In essence, we must be satisfied that subjecting BCS and Robert to this antitrust litigation in Georgia is reasonable. *Burger King v. Rudzewicz,* 105 S.Ct. at 2184. We note, however, that "[w]here a defendant who purposefully has directed his activities seeks to defeat jurisdiction," as is the case here, "he must present a *compelling* case that the presence of some other consideration would render jurisdiction unreasonable." *Id.* at 2185 (emphasis added).

In *World-Wide Volkswagen,* the Supreme Court noted five factors which are important in the reasonableness assessment of a forum's assertion of jurisdiction over a non-resident defendant. The "burden on the defendant" must be weighed against "the forum state's interest in adjudicating the dispute", the "plaintiff's interest in obtaining convenient and effective relief", "the interstate judicial system's interest in obtaining the most efficient resolution of the controversies", and the "shared interest of the several States in furthering fundamental substantive social policies." 444 U.S. at 292, 100 S.Ct. at 564. *See also Burger King v. Rudzewicz,* 105 S.Ct. at 2184. These criteria echo the reasonableness factors employed by Georgia courts in their application of the Georgia long-arm statute. For the reasons stated in our discussion of the Georgia statute, we reaffirm our conclusion that the assertion of Georgia's jurisdiction over BCS and Robert is entirely reasonable.[14]

---

**14.** Support for our conclusion also exists in the federal case law. For example, in *Keeton v. Hustler Magazine Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), the plaintiff sought damages in a New Hampshire federal district court for the allegedly defamatory publication and distribution of various editions of *Hustler* magazine in numerous states, including New Hampshire. The defendant's place of incorporation and principal place of business were outside the forum state. In holding that personal jurisdiction was appropriate, the Supreme Court

noted that "it is beyond dispute that New Hampshire has a significant interest in redressing injuries that actually occur within the State." *Id.* at 776, 104 S.Ct. at 1479. In addition, New Hampshire "also has a substantial interest in cooperating with other states ... to provide a forum for efficiently litigating all issues and damages claims arising out of a libel in a unitary proceeding." *Id.*

In this case, Georgia similarly has a legitimate and compelling interest in redressing the inju-

## III. VENUE: BCS and Robert

In a federal antitrust case, venue may be established under § 4 of the Clayton Act, 15 U.S.C. § 15,[15] § 12 of the Clayton Act, 15 U.S.C. § 22, or the general federal venue statute, 28 U.S.C. § 1391(b). Delong asserts that with respect to both Robert and BCS, venue is appropriate in the Northern District of Georgia under the general federal venue statute. We agree.[16]

Section 1391(b) provides that "a civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose...." 28 U.S.C. § 1391(b). It is evident that none of the defendants reside or are found in Georgia. Therefore, we must consider whether Delong's antitrust claim arose in the Northern District of Georgia.

Several different tests exist for determining the district in which a claim arises for venue purposes. The most widely utilized method, which we choose to rely upon here, is the "weight of the contacts" test, which establishes venue in the district where the contacts weigh most heavily. *Vest v. Waring*, 565 F.Supp. 674, 690 (N.D.

Ga.1983).[17] Once it is determined that the weight of the contacts rests most heavily in a particular district, the court then must look to see whether venue is established over each defendant. *Id; Caribe Trailer Systems, Inc. v. Puerto Rico Maritime Shipping Authority*, 475 F.Supp. 711, 715 (D.D.C.1979). Evidence that a particular defendant has performed a substantial or significant act related to the claim in the district where contacts weigh most heavily suffices to establish venue over that defendant. *Id.*

Several federal district courts have applied the "weight of the contacts" test in antitrust actions. In *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.*, the District Court for the Eastern District of Pennsylvania explained that to determine venue over defendants in an antitrust case, the court "will look to the place wherein venue is claimed to exist and determine [venue] on the basis of sales, injury, conspiratorial meetings, and overt acts pursuant to such meetings." 309 F.Supp. 1053, 1056 (E.D. Pa.1969). Because no sales or significant conspiratorial meetings occurred in the

---

ries suffered by the resident Georgia plaintiffs. In addition, Georgia has an interest in consolidating all the potential antitrust claims into a single litigation so that the matter may be resolved as efficiently as possible.

15. Section 4 of the Clayton Act, 15 U.S.C. § 15, permits venue with respect to any antitrust defendant "in any district court of the United States in the district in which (1) the defendant resides or (2) is found or (3) has an agent." Delong does not contend that any of the defendants come under the terms of this section, therefore we do not address its applicability.

16. In addition, Delong asserts that venue in the Northern District of Georgia with respect to BCS also is justified under § 12 of the Clayton Act. Because we conclude that venue is established under the general federal venue statute, we do not reach the appropriateness of venue under § 12 of the Clayton Act.

It is appropriate for us to decide the venue question from the general venue statute alone, without also considering the applicability of the special antitrust venue statute. As this court noted in *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 417 n. 3 (11th Cir.1984), "[t]he majority of courts considering the joint

operation of the venue provisions of the Clayton Act and § 1391(b) have held that the Clayton Act's specific venue provisions do not 'abolish or supersede the available districts mentioned in the general venue provisions of § 1391(b).'" *See also Vest v. Waring*, 565 F.Supp. 674 (N.D. Ga.1983), in which the district court applied the general venue provision to establish venue over an individual defendant after the parties conceded that venue could not lie under the special antitrust venue statute, 15 U.S.C. § 15.

17. The other two tests are the "American Law Institute test" (ALI), which places venue in any district in which a substantial part of the acts related to the claim occurred, *see Cochrane v. Iowa Beef Processors*, 596 F.2d 254, 261 (8th Cir.), *cert. denied sub. nom Iowa Beef Processors v. Hawkins*, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979), and the "place of the injury test" which establishes venue where the injury occurred. *See Iranian Shipping Lines, S.A. v. Moraites*, 377 F.Supp. 644 (S.D.N.Y.1974). For a general discussion of the different standards, *see Dody v. Brown*, 659 F.Supp. 541, 546–47 (W.D.Mo.1987). The "weight of the contacts" approach is the most stringent of the venue tests. Because we find venue under the "weight of the contacts" test in this case, we do not consider the other tests.

Eastern District of Pennsylvania, the court found venue inappropriate. Similarly, in *Athletes Foot of Delaware v. Ralph Libonati Co.*, 445 F.Supp. 35, 45 (D.Del.1977), the district court applied a similar test to the one quoted above and held that venue was improper because there was *"no* allegation that conspiratorial meetings nor any overt act by [defendant] in furtherance of the alleged conspiracy, [nor any substantial sales] occurred in this district." Finally, the court in *Caribe Trailer Systems* stated that attendance at a meeting in the district that involved an *attempted* violation of the antitrust laws was sufficient to establish venue under the weight of the contacts test. 475 F.Supp. at 719.

Attendance at a single conspiratorial meeting in the district is enough to establish venue. In *Vest v. Waring, supra,* the District Court for the Northern District of Georgia found venue was proper for defendants whose sole contact with the district was attendance of a meeting at the Atlanta airport at which the alleged conspiracy was hatched. The court explained:

> These [defendants] all attended the Atlanta airport meeting in March, 1980, at which the alleged conspiracy was purportedly born. If in fact a conspiracy is ultimately found, it does appear that this meeting, led by defendant Waring, will be deemed a significant event. On a threshold motion involving venue, this court cannot, and indeed should not, make a determination regarding the merits that must be reserved for the factfinder once all discovery has terminated. The court need not, therefore, find at this time that the defendants attending this meeting in fact knowingly participated in a conspiracy. Rather, because the plaintiff has successfully alleged these defendants had substantial significant contacts with the district in connec-

tion with the claimed conspiracy, in the form of their attendance at this meeting, the motions by these defendants to dismiss for improper venue is denied.

565 F.Supp. at 692.

█ In this case, it is undisputed that Robert, on behalf of BCS, attended a two-hour meeting with Harold Delong in Atlanta. Although the parties offer different versions of what transpired during the meeting, in the posture of this case we must accept Delong's version, to which he attests in his affidavits. Delong's version of the meeting was that Robert said the Pratt & Whitney (Columbus) account belonged to BCS but that there was plenty of money in it for both BCS and Delong if Delong would agree to sell the specially marked premium-priced BCS media to Pratt & Whitney, rather than lower-priced stock media. Even though Delong rejected Robert's offer to join forces with BCS as a media supplier to Pratt & Whitney's Columbus plant, we conclude that Delong's version of the meeting may constitute at least an attempt by Robert and BCS to violate the antitrust laws.

In addition to the conspiratorial meeting, the injury occurred in the Northern District and there are, at a minimum, inferences of sales of the premium-priced "BCS" media to Republic Airlines in Atlanta. We conclude that these contacts satisfy the "weight of the contacts" test and hold that venue with respect to the claims against BCS and Robert Biebel is proper in the Northern District of Georgia.

The appellees emphasize that Congress, through the "where the claim arose" language, did not intend to allow plaintiffs to place venue where they reside, quoting the "equal plausibility" test enunciated in *Leroy v. Great Western United Corp.*, 443 U.S. 173, 185, 99 S.Ct. 2710, 2717, 61 L.Ed. 2d 464 (1979), for support.[18] While we

---

18. We need not apply the "equal plausibility" test promulgated in *Leroy* which the defendants cite in their brief. This test is applicable in the "unusual case" when it is not clear that the claim arose in any one district. In such a situation, the *Leroy* Court held that the court should select a venue from among equally plausible districts based on "the availability of wit-

nesses, the accessibility of other relevant evidence, and the convenience of the defendant (but not of the plaintiff)." 99 S.Ct. at 2717. The former Fifth Circuit, however, chose not to apply the factors listed under the *Leroy* equal plausibility test to decide a venue question in what it felt was not the "unusual case." *See American Carpet Mills, Etc. v. Gunny Corp.*, 649

agree that the general venue provision of 28 U.S.C. § 1391(b) certainly is not intended to give plaintiffs free reign in selecting the proper district in which to bring a claim, we must consider the venue issue in light of the history of § 1391 and the underlying concerns addressed by the venue statute.

■ Unlike personal jurisdiction issues, which primarily concern the extent of a court's power over the parties and the fairness of requiring a party to defend itself in a foreign forum, venue primarily addresses the convenience of the forum. *Leroy*, 99 S.Ct. at 2715. Venue choices are "restricted to 'a place which may be more convenient to the litigants'—i.e., both of them—'or to the witnesses who are to testify in the case.'" *Id.* at 2717. *Time, Inc. v. Manning*, 366 F.2d 690, 696 (5th Cir.1966).

In its original form, the general venue statute only allowed venue in the district where all the defendants resided. Because of the concern with convenience and multi-party cases, § 1391 was amended in 1966 to add language allowing venue to lie where the claim arose, as well as where the defendants reside. As the Supreme Court explained in *Leroy:*

> The amendment of § 1391 to provide for venue where the claim arose was designed to close the "venue gap" that existed under earlier versions of the statute in situations in which joint tortfeasors, or other multiple defendants who contributed to a single injurious act, could not be sued jointly because they resided in different districts.

99 S.Ct. at 2717 n. 17, citing *Brunette Machine Works v. Kockums Industries*, 406 U.S. 706, 710 n. 8, 92 S.Ct. 1936, 1939 n. 8, 32 L.Ed.2d 428 (1972). Given the judicial system's great concern with the efficient conduct of complex litigation, an important consideration in deciding appropriate venue is whether a forum can meet the personal jurisdiction and venue requirements for most or all of the defendants in a multi-party lawsuit. *Lamont v. Haig*, 590 F.2d 1124, 1134 n. 62 (D.C.Cir.1978) ("An additional, important consideration might be ensuring the existence of at least one forum wherein venue and personal jurisdiction requirements permit multi-party litigation to proceed.")

This case involves defendants whose residence or primary place of business is in Connecticut, Florida, or Massachusetts, all of whom have substantial contacts with Georgia, but none of whom have alleged any contacts with the other states. If we were to rule, for example, that venue properly should be in Connecticut because of BCS' and Robert's connections there, we most likely would preclude Delong from carrying on its suit against the Washington Mills defendants, who have little, if any, contact with Connecticut. Delong's selection of the Northern District of Georgia as venue for the antitrust action must be viewed with the residency of all the defendants in mind, not merely that of Robert, William and BCS. Keeping the interest of all the litigants in mind, it is evident that the Northern District of Georgia is an appropriate forum in which the antitrust action can proceed against all the defendants.

## IV. CONCLUSION

In summary, we hold that William Biebel did not have the sufficient contacts to allow effective service of process over him; therefore, we affirm the district court's dismissal of William from the lawsuit. With respect to Robert Biebel and BCS Corporation, however, we reverse their dismissal by the district court. Service of process on Robert was authorized under O.C.G.A. § 9–10–94; service of process on BCS was authorized under the nationwide

F.2d 1056, 1059 (5th Cir. Unit B 1981) (In action involving breach of contract, venue is at the place of performance, thus the court does not need to address whether that forum was inconvenient to the defendant under the *Leroy* equal plausibility test). *See also Dody v. Brown*, 659 F.Supp. 541, 550 (W.D.Mo.1987) ("In those other not so unusual cases where it is clear that the cause of action arises in one of a number of possible districts ... the holding in *Leroy* and the equal plausibility standard would not be applicable."). Because we conclude that this is not an unusual case, and that venue clearly lies in the Northern District of Georgia when all the interests of defendants are taken as a whole, we do not need to apply the *Leroy* criteria.

service of process provision of the Clayton Act, 15 U.S.C. § 22. Personal jurisdiction over Robert and BCS was appropriate because both defendants have "constitutionally sufficient relationships" with Georgia, the forum state for this litigation, and are amenable to service of process. Venue over Robert and BCS is properly in the Northern District of Georgia under 28 U.S.C. § 1391(b), the general federal venue statute.

AFFIRMED in part, REVERSED in part, and REMANDED.